# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| **WESTGATE RESORTS, LTD, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | **Case No. 3:20-cv-00599** |
| ) | **Judge Trauger/Frensley** |
| **WESLEY FINANCIAL GROUP, LLC,** ) | |
| **and CHARLES WILLIAM MCDOWELL III,** ) | |
| ) | |
| **Defendants.** ) | |

## ORDER

## I. INTRODUCTION

In this lawsuit involving the timeshare industry, Plaintiffs Westgate Resorts, Ltd. and affiliated Westgate entities (collectively, "Westgate") allege that Defendants Wesley Financial Group, LLC and Charles William McDowell III (collectively, "Wesley") violated the Lanham Act (15 U.S.C. § 1125(a)) and the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201, *et seq.*) by actions related to Wesley's advertising, marketing, and timeshare cancellation services. Docket No. 104 (Amended Complaint), p. 17-25. Wesley denies the allegations and has filed a Motion to Dismiss, which is pending. Docket No. 105.

This matter is now before the Court upon Wesley's "Motion for Protective Order as to Attorneys' Eyes Only Designations of Customer Information," in which Wesley asks the Court to affirm Wesley's attorneys' eyes only ("AEO") designation of discovery documents that contain customer-identifying information. Docket No. 49. Westgate has filed a Response in Opposition, and Wesley has filed a Reply. Docket Nos. 99, 100. With the Court's permission,

Westgate has filed a Supplemental Memorandum in Opposition, to which Wesley filed a Supplemental Reply. Docket Nos. 114, 119. For the reasons set forth below, Wesley's Motion (Docket No. 49) is GRANTED IN PART and DENIED IN PART.

## II. LAW AND ANALYSIS

### A. Discovery Requests and Protective Orders

Discovery in federal court is governed by the Federal Rules of Civil Procedure, which provide that a party may request production of documents or other tangible items as long as the information sought is within the scope of discovery. Fed. R. Civ. P. 34(a); *see also* Fed. R. Civ. P. 26(b)(1). In general, the scope of discovery extends to nonprivileged information that is relevant to any party's claim or defense, regardless of whether the information sought is admissible, that is "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The Rules were amended, effective December 1, 2015, in part to address the alleged costs and abuses attendant to discovery. Under Rule 26, "[t]here is now a specific duty for the court and the parties to consider discovery in the light of its 'proportional[ity] to the needs of the case . . . .'" *Turner v. Chrysler Grp. LLC*, No. 3:14-1747, 2016 U.S. Dist. LEXIS 11133, at *2, (M.D. Tenn. Jan. 27, 2016), *quoting* Fed. R. Civ. P. 26(b)(1). The following factors are relevant to a consideration of whether the scope of discovery is proportional:

> (1) the importance of the issues at stake in the action,
> (2) the amount in controversy,
> (3) the parties' relative access to relevant information,
> (4) the parties' resources,
> (5) the importance of the discovery in resolving the issues, and
> (6) whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1) (numbering added). "Nevertheless, the scope of discovery is, of course, within the broad discretion of the trial court." *United States v. Carell*, No. 3:09-0445, 2011 U.S.

Dist. LEXIS 57435 at *5 (M.D. Tenn. May 26, 2011), *quoting Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998) (internal quotation marks omitted).

The Court has the authority under Rule 26(b)(2)(C) to limit the frequency or the extent of discovery otherwise allowed by the rules. The Sixth Circuit has observed that "the desire to allow broad discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant." *Surles v. Greyhound Lines, Inc.*, 474 F. 3d 288, 305 (6th Cir. 2007), *quoting Scales v. J. C. Bradford*, 925 F. 2d 901, 906 (6th Cir. 1996). As to the judge's role in discovery disputes, "[t]he revisions in Rule 26(b)(2) are intended to provide the court with broader discretion to impose additional restrictions on the scope and extent of discovery." *Surles,* 474 F. 3d at 305. That sentiment has continued through subsequent revisions to Rule 26 including the most recent ones.

A motion for a protective order is available to "a party or any person from whom discovery is sought." Fed. R. Civ. P. 26(c). The court may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." Fed. R. Civ. P. 26(c)(1)(G). Good cause for the issuance of a protective order is established with "specific facts showing 'clearly defined and serious injury' resulting from the discovery sought and cannot rely on merely conclusory statements." *Nix v. Sword*, 11 F. App'x 498, 500 (6th Cir 2001) *quoting Avirgan v. Hull*, 118 F.R.D. 252, 254 (D.D.C. 1987).

The Court also possesses inherent authority to manage litigation. As noted by the First Circuit, "[a]s lawyers became more adept in utilizing the liberalized rules . . . [t]he bench began to use its inherent powers to take a more active, hands on approach to the management of

pending litigation." *In re San Juan DuPont Plaza Hotel Fire Litigation*, 859 F. 2d 1007, 1011 (1st Cir. 1988). "The judiciary is 'free, within reason to exercise this inherent judicial power in flexible pragmatic ways.'" *Id.* at 1011, n.2, *quoting HMG Property Investors, Inc. v. Parque Indus. Rio Canas, Ins.*, 847 F. 2d 908, 916 (1st Cir. 1988).

## B. The Parties' Discovery Dispute

The Parties' Confidentiality Agreement provides as follows:

**Documents Which May Be Designated.**

. . .

> Any Party or third party may designate documents as attorneys eyes only that, after a good faith review, have been determined to contain information protected from disclosure by statute, or to contain sensitive personal information, trade secrets, confidential research, development, or commercial information, proprietary information, or information concerning proprietary internal policies and procedures of such a nature that disclosure to a Party itself will independently cause competitive or other injury.

Docket No. 49-8, p. 3-4.

Westgate objects to Wesley's AEO designation of documents that, alone or in combination, reveal the identities of Westgate customers who have become clients of Wesley's, arguing that the AEO designation has been applied to 99% of Wesley's production and is hampering Westgate's ability to prepare its case. Docket Nos. 99, 114. As to the number of documents designated, Wesley contends that "[a] large portion of Westgate's document requests seek the production of documents that would reveal the identity of Wesley's customers. As a result, a large portion of Wesley's production has been designated 'Attorneys' Eyes Only.'" Docket No. 100, p. 4. Wesley further argues that the designation is necessary for two reasons. First, because if Westgate learns the identities of these clients, Westgate will stop negotiating with them regarding their timeshare contracts, damaging the clients and preventing Wesley from conducting its business and earning

4

its fee as to those clients; and second, because Westgate might share the information outside of this litigation in a way that would reach Wesley's competitors or other timeshare developers, further damaging Wesley. Docket Nos. 49, 100, 119. Westgate contends that customers identities are not even confidential, much less AEO confidential, and that it is entitled to the information because the clients were Westgate's customers first. Docket No. 99, p. 1, 4. Westgate denies that it would share the information with Wesley's competitors. *Id.* at 16.

A little background is necessary to understand the dispute over sharing the clients' identities. According to the Parties' own descriptions, Westgate is a timeshare developer that "builds buildings, manages those building[s] and sells timeshare occupancy in those buildings." Docket No. 99, p. 15. Wesley "is in the business of assisting timeshare owners who are the victims of fraud, deception, or other improper conduct in terminating their timeshare interests." Docket No. 49, p. 3. To that end, Wesley engages with timeshare owners (including owners of Westgate timeshares) to assist them in terminating those interests. *Id.* But, Wesley alleges that "timeshare developers – and Westgate in particular – generally stop negotiating with a timeshare owner when they discover or believe that he or she is assisted by a third party." Docket No. 49, p. 4. To support this claim, Wesley has attached what purports to be a letter from Westgate to one of these owners:

> [T]he Developer has opted not to assist owners who have chosen to work with a third-party company. Our records show that [the customer] advised us that you were working with an outside party, because of this, we retracted our offer to assist you with release . . . . [A]lthough the release of your contract is no longer an option, we are more than happy to assist you with your ownership and vacation needs.

Docket No. 49-3, p. 2. Wesley contends that due to Westgate's policy of ceasing negotiations with those customers who have chosen to work with Wesley and refusing to release them from their contracts, "Wesley and its customers agree to keep their relationship and Wesley's assistance

5

confidential." Docket No. 49, p. 5. Wesley has outlined the numerous measures it takes to keep client identities confidential, from including a confidentiality clause in its contracts with the clients to internal policies and practices intended to keep identifying information safe. *Id.* at 5-8.

Meanwhile, Westgate asserts that "[t]he notion that [Wesley] can conceal Westgate's own customers *from Westgate* is absurd." Docket No. 99, p. 1 (emphasis in original). Westgate argues that "[Wesley's] real reason for secrecy is not because this information and these documents are 'confidential' but because [Wesley's] fraudulent scheme – institutionalized tortious interference as a business model – only works in the pitch blackness of secrecy and lies." *Id.* at 2. Westgate essentially concedes that it stops negotiating with timeshare owners who are found to be working with Wesley ("Westgate has a corporate policy not to work with companies, like [Wesley], whose sole business objective is to disrupt Westgate's relationships with its customers"). *Id.* at 3. Westgate asserts that:

> Westgate's policy is in place to protect its customers and its business from companies that prey on those customers, falsely advertising that their assistance is needed to "exit" their timeshare, and lure those individuals to pay them thousands of dollars, sometimes into the five figures, to help them do something they could do themselves.

*Id.*

Wesley argues that Westgate's true motivation in seeking these customers' identities is to use the discovery process to put Wesley out of business:

> If this Court were to simply assume that [Westgate] will win based on unsubstantiated rhetoric and give them access to Wesley's customer information, [Westgate] will almost certainly cease dealing with Wesley's customers. Through the discovery process, [Westgate] will then have indirectly achieved the result they seek on the merits by preventing Wesley from assisting its customers and by dissuading use of third-party assistance generally – even if

6

> [Westgate's] claims are ultimately unsuccessful and the court in
> the appropriate forum finds that Wesley has not engaged in
> deceptive or unfair practices.

Docket No. 49, p. 18. Westgate concedes that "if Westgate learns which of its customers have lied for [Wesley], [Wesley] knows that its scheme will fail" and asserts that Wesley is attempting to "delay the inevitable death of its cash cow." Docket No. 99, p. 2, 7.

Westgate argues that the AEO designation, which covers the bulk of Wesley's production, is impeding its ability to prepare this case:

> With the attorneys' eyes only designation, [Wesley] may prepare
> its defenses in this case unimpeded, but Westgate cannot.
> Westgate – *the Plaintiff* – cannot even see the discovery and so
> cannot research its own records, evaluate its claims and assist its
> attorneys, all of the things that any plaintiff is entitled to do and, *in
> this particular case*, the things that would allow this case to expose
> [Wesley's] fraud.

Docket No. 99, p. 7 (emphasis in original).

Additionally, Westgate asserts that Wesley has issued numerous discovery requests that cannot be responded to without access to customer information. Docket No. 114. For example, Wesley apparently propounded the following interrogatories:

> 3. Identify and describe all damages allegedly suffered by you
> resulting from the allegations set forth in the Amended Complaint,
> including a statement of the dollar amount sought for each
> category of damages and the calculations used to arrive at that
> amount.
>
> . . .
>
> 12. Identify all former or current Westgate timeshare owners
> whom you contend have been deceived, confused, or mislead by
> [Wesley's false or misleading advertising].
>
> . . .
>
> 18. Describe all timeshare contracts with which you allege Wesley
> interfered, including the identity of the timeshare owner who was a

> party to any such contracts, the date of each contract, what Wesley
> did to interfere with each contract, and all persons with knowledge
> of the alleged interference.

Docket No. 114-2, p. 11, 13, 15.  Westgate points out that it will not be able to respond to these requests without knowing which of its customers have worked with Wesley.  Docket No. 114.  Westgate contends that it would be difficult to even calculate its damages without that information, since it cannot determine which of its customers that were released from their contracts (or had those contracts terminated in whatever fashion) were Wesley clients.  *Id.* at 6.

Wesley states that it is "sensitive to that concern," and proposes the following solution:

> (a) The parties will confer about and agree on a Westgate in-house lawyer who shall be designated to review attorneys' eyes only information when reasonably necessary for the purposes of this lawsuit and shall sign an acknowledgement that any attorneys' eyes only information shall not be used for purposes other than this action or disclosed to any other person apart from Plaintiff's counsel of record in this action.
>
> (b) If counsel for Plaintiffs believes in good faith that it is necessary to disclose specific attorneys' eyes only material to a client representative in order to efficiently litigate this matter, counsel for Plaintiffs shall confer with counsel for Wesley to determine if Wesley will consent to disclosure to the in-house lawyer designee or to redactions that will resolve any confidentiality concerns.
>
> (c) If the parties are unable to reach an agreement, Wesley shall file a motion for protective order consistent with this Court's Standing Order on Confidential Information.

Docket No. 49, p. 22.

Westgate rejects this proposed approach:

> And Wesley's simplistic "solution" – designated Westgate
> personnel and the civilian equivalent of a Chinese wall – is no
> solution at all.  Westgate is a large organization with numerous
> operational components and Wesley's discovery requests cut
> across many of those divisional lines.  Moreover, any such

> approach ignores that a list of Westgate timeshare owners who, much later, paid Wesley's exorbitant fees for illusory services, is not protectable at all; it is not even "Confidential" much less "AEO Confidential." These people were *Westgate's* customers first (and still) and, if protectable at all, protectable only by *Westgate*.

Docket No. 114, p. 6 (emphasis in original).

The Court agrees that Wesley's proposed solution is impracticable. Given the large percentage of material currently designated AEO (Wesley does not dispute Westgate's contention that it is 99% of the production), the process that Wesley described would be in constant use as Westgate attempts to respond to discovery requests like the ones above and otherwise prosecute its case. This will likely result in high-volume motions practice and significant delays.

Based on the steps taken by Wesley to keep customer identities secret and the value of that secrecy to Wesley's business, the Court finds that that information is sensitive and confidential under these circumstances. Further, the Court finds that documents that would reveal the identity of Westgate customers who are current Wesley customers fall under the Parties' definition of "attorneys' eyes only" (*see* Docket No. 49-8, p. 3-4) because they contain sensitive commercial information of such a nature that disclosure to Westgate itself will independently cause competitive injury to Wesley (because it will lose those customers and their fees) and "other injury" to those customers, third parties not before the Court who will lose the opportunity to have their timeshare interest terminated, a result they are apparently prepared to pay money to achieve. The Court is especially concerned about the injury to these nonparties, who have no part and no representation in this lawsuit. The Court also agrees that revealing the customer identities would allow Westgate to accomplish via discovery what it seeks to achieve through a judgment in this lawsuit: the destruction of Wesley's timeshare exit business. While it

9

may indeed be that that is the eventual outcome of the suit, Wesley is correct that discovery is not the appropriate vehicle for achieving that goal. Thus, Wesley has established good cause for a protective order, with specific facts showing clearly defined and serious injury resulting from discovery seeking the identity of Wesley's *current* customers. *See Nix*, 11 F. App'x at 500. Therefore, AEO documents pertaining to *current* Wesley customers (those who are still in the process of attempting to terminate their timeshare interest) that contain customer-identifying information will remain AEO. This includes documents that can be used in combination to determine the identities of the current customers, as described by Wesley. *See* Docket No. 49, p. 15-16.

But, Westgate has a clear need for access to information in order to assist its attorneys in prosecuting its case and responding to Wesley's discovery requests. For that reason, the Court will order Wesley to de-designate documents that contain customer-identifying information where those documents identify *former* customers who have already succeeded in terminating their timeshare interest with Wesley's assistance, via foreclosure or by being offered a deed in lieu of foreclosure. These customers will be Westgate's best source of data regarding financial loss, because those terminated contracts are the ones on which Westgate contends it has lost money. *See* Docket No. 99, p. 14. Damage to the nonparties should be minimized, because their contracts are already terminated, and Wesley will not sustain competitive damage for the same reason.

As it would be manifestly unfair to expect Westgate to respond to discovery requests that seek information about Wesley's current customers (whose identities will remain known only to Westgate's attorneys), Wesley will have to accept the following modification of its discovery requests as a necessary consequence of its protective order: all requests that seek the identity of

10

current shared customers or are otherwise dependent on that information are modified to include only the former customers that Wesley makes known to Westgate. *See* Fed. R. Civ. P. 26(b)(2)(C); *Surles*, 474 F.3d at 305 ("the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant"). The Court has also considered the factors set forth in Rule 26(b)(1) and determined that these modifications allow for the most proportional discovery in this matter, balancing the relative benefits and burdens. *See Turner*, 2016 U.S. Dist. LEXIS 11133, at *2. Finally, the Court reminds the Parties of their continuing duty under Rule 26(e)(1) to supplement their discovery responses when appropriate. Specifically, the duty to supplement will arise when and if current shared customers conclude their negotiations with Westgate and have their contracts terminated, necessitating additional disclosures by Wesley.

### III. CONCLUSION

For the foregoing reasons, Wesley's Motion (Docket No. 49) is GRANTED IN PART and DENIED IN PART.

**IT IS SO ORDERED.**

**Jeffery S. Frensley**
**United States Magistrate Judge**