**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **WESTGATE RESORTS, LTD.,** *et al.***,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-cv-00599** |
| | ) | **Judge Aleta A. Trauger** |
| **WESLEY FINANCIAL GROUP, LLC,** | ) | |
| **and CHARLES WILLIAM** | ) | |
| **McDOWELL, III,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM – DEFENDANTS' SUMMARY JUDGMENT MOTIONS

As set forth in the Third Amended Complaint ("TAC") (Doc. No. 217), the operative pleading in this case, the plaintiffs—two Florida limited partnerships, thirteen Florida limited liability companies, and one Delaware limited liability company—are collectively engaged in the business of developing, financing, managing, and selling timeshare resort properties throughout the United States. (Doc. No. 217 ¶ 1.) All of the plaintiffs are affiliated and have "Westgate" in their name, and they are collectively referred to herein, in the singular, as "Westgate" or "the plaintiff." Defendant Wesley Financial Group, LLC ("Wesley"), a Tennessee limited liability company, is in the business of helping timeshare owners get out of their timeshare obligations. Its CEO and sole member, Charles William McDowell, III, is also named as a defendant.

Westgate alleges that Wesley is engaged in a fraudulent "timeshare cancellation scheme with no legitimate foundation" that is "designed to induce" individuals who own timeshares through Westgate ("Westgate owners") to "breach their Purchase Agreements with, and related obligations to, Westgate." (Doc. No. 217 ¶ 51.) The scheme allegedly involves, among other

things, engaging in false and misleading marketing claims and advertisements; providing unauthorized legal services or engaging in the unauthorized practice of law; leading Westgate owners to believe that they have a legal basis for cancelling their timeshare contracts; instructing Westgate owners to stop making payments on their timeshare mortgages or to stop paying maintenance fees if they do not have a mortgage; and leading Westgate owners to believe that any penalty for ceasing payments to Westgate will be of little legal consequence or that Wesley will repair any credit damage or other consequence to the owners. Based on this alleged scheme, Westgate asserts claims against both Wesley and McDowell for (1) violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* (the "FDUTPA") and (2) violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.* (the "TCPA"). Westgate seeks both damages and injunctive relief.

Wesley has filed a Motion for Partial Summary Judgment (Doc. No. 272), and McDowell has filed a Motion for Summary Judgment (Doc. No. 274).[1] In its motion, Wesley argues that (1) Westgate cannot recover under *both* the FDUTPA and the TCPA and that, applying the applicable choice-of-law rules leads to a conclusion that Tennessee substantive law applies and that, consequently, dismissal of the FDUTPA claim is required; (2) Westgate is not entitled to an injunction "that would purport to limit Wesley's conduct as it relates to timeshare companies other than Westgate and individuals who do not own a Westgate timeshare sold by Plaintiffs" (Doc. No. 273, at 2); (3) Westgate cannot establish damages with respect to any Westgate owners who have stopped payment on their timeshare mortgages but whom Westgate has not deposed to determine why they stopped payment; and (4) Westgate cannot obtain damages or injunctive relief in

---

[1] Westgate's pending Motion for Partial Summary Judgment (Doc. No. 263), and a number of ancillary motions are also pending. The court will consider those motions separately.

connection with "[s]pecific categories of conduct for which Plaintiffs have failed to prove causation or an actionable injury" (*id.* at 14), including Wesley's advertisements, Wesley's alleged failures to comply with the Tennessee Uniform Debt-Management Services Act and the Tennessee Credit Services Businesses Act, Wesley's allegedly ghostwriting correspondence for Westgate owners and impersonating Westgate owners in communications with Westgate, and Wesley's "efforts to assist so-called 'zero-debt' customers" (*id.* at 19)—that is, Westgate owners who do not carry a mortgage on their timeshare interests.

For his part, McDowell argues that he is entitled to summary judgment, because an individual cannot be liable under the TCPA or the FDUTPA unless he directly participates in the allegedly deceptive conduct that proximately caused the plaintiff's harm, and there is no evidence of McDowell's direct participation in the alleged scheme. (Doc. No. 274.) In the alternative, McDowell adopts and incorporates Wesley's arguments.

The plaintiff opposes both motions. The parties have filed Statements of Undisputed Material Fact and Responses thereto, Statements of Additional Fact and Responses thereto, Reply briefs, and mountains of evidentiary material.

## I.     LEGAL STANDARD

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion

for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). If the non-moving party asserts that a fact is genuinely disputed, it generally "must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Pittman*, 901 F.3d at 628 ("The nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" (quoting *Anderson*, 477 U.S. at 250)). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## II. WESLEY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### A. Facts Relevant to Wesley's Motion[2]

Westgate oversees Westgate timeshare resorts located throughout the country, but its corporate headquarters is located in Florida. Wesley's principle place of business is in Franklin,

---

[2] The facts for which no citation is provided are drawn from Westgate's Response to Wesley's Statement of Material Facts (Doc. No. 286-3) or the defendants' Response to Westgate's

Tennessee. Since January 1, 2018, most of Wesley's employees have worked out of Wesley's Tennessee office. In addition, since January 1, 2018, the entirety of Wesley's executive team and all other individuals with policymaking authority over the Marketing Department, Sales Department, and Resolutions Department (which provides services to Wesley's customers) have worked out of Wesley's Tennessee office.

Westgate alleges that it has been damaged by the failure of Westgate owners who are also Wesley customers to make mortgage payments on their Westgate timeshares. These defaulting owners reside in at least forty-five different states, Canada, and Puerto Rico.

According to Wesley, "[m]ultiple Wesley customers" deposed in this case have testified that Wesley did not "instruct" them to stop making payments on their Westgate timeshares and that the decision to stop making payments was their choice. (*See* Wesley's Statement of Undisputed Material Fact ("SUMF"), Doc. No. 273-1 ¶ 4.) In one of the deposition excerpts attached to Wesley's SUMF, Wesley customer Clayton Johns testified that he could not remember if he ever made another regular mortgage payment to Westgate after talking to Wesley and that the Wesley employee whom he spoke with told him that "they can't tell you not to pay them" but instead told customers "what other people did." (Johns Dep. 77–78, Doc. No. 273-4, at 2–3.) He also insisted that "nobody told us to stop [making payments]. It was our choice." (*Id.* at 86. , Doc. No. 273-4, at 4.) Another Westgate owner, Leonard Wiuff, stated that he did not "rely on Wesley to advise [him] with respect to whether [he] should make [his] payments to Westgate," though he also stated that he relied on Wesley to advise him how to proceed once he stopped making payments. (Wiuff Dep. 61, Doc. No. 273-5, at 2.)

---

Supplemental Statement of Undisputed Facts (Doc. No. 310-2), filed in response to both defendants' summary judgment motions. The facts recited herein are undisputed for purposes of Wesley's Motion for Partial Summary Judgment unless otherwise indicated.

Westgate disputes the implication that Wesley did not instruct or encourage Westgate owners to stop making mortgage payments. It points to Wiuff's testimony confirming that Wesley told him that "Wesley cannot tell [him] what to do with respect to making payments to Westgate," that he would "have to decide whether to continue paying Westgate or not," that, if he stopped making payments to Westgate and Westgate made an adverse credit report, "Wesley has a partner credit repair company, included in Wesley's service, that would repair any negative credit marks," that "the majority of Wesley's customers stop making payments to the timeshare company," and that the "timeshare company views a paying customer as a happy customer." (Wiuff Dep., Doc. No. 265-40, at 12–13.)[3] Wesley does not dispute, for purposes of the *plaintiff's* Motion for Partial Summary Judgment at least, that "Wesley made it clear to Wiuff that stopping payment to Westgate was part of Wesley's plan; if Wiuff stopped making payments to Westgate, then Wesley would provide credit repair, but if Wiuff could not or would not stop making payments to Westgate, then there was nothing else to be done." (Defs.' Resp. to Westgate's SUMF ¶ 187(n), Doc. No. 289-1.)

---

[3] Westgate's citations to the record are confusing, to say the least, insofar as Westgate cites its own Statement of Fact and Supplemental Statement of Facts, filed in support of its own Motion for Partial Summary Judgment, in responding to Wesley's Statement of Undisputed Material Facts, rather than citing the actual evidence that supports its denials, thus requiring the court to sift through multiple documents to locate the evidence on which Westgate seeks to rely. Even then, its citations are frequently unhelpful. For instance, in denying Wesley's SUMF ¶ 4, Westgate states: "Denied. SOF at 187 (Lenny Wiuff); Supp. SOF 187(l)-(o); 194(b)-(d) (Clayton Johns)." (Doc. No. 286-3 ¶ 4.) Paragraph 187 of Westgate's Statement of Undisputed Fact (Doc. No. 265-1) actually consists of nineteen paragraphs ((a) through (s)), and Westgate's "Supplemental Statement of Undisputed Facts" begins at paragraph 194. (Doc. No. 286-4.) The process of locating Westgate's citations to the deposition excerpts contained in Westgate's own Statement of Fact (and Supplemental Statement) is further complicated by the fact that, although Westgate refers to the depositions by their original pagination numbers, as assigned by the court reporter, many of the excerpts Westgate provided do not contain those page numbers. (*See, e.g.*, Wiuff Dep. excerpt, Doc. No. 265-40; Johns Dep. excerpt, Doc. No. 286-5.) The court has nonetheless endeavored to locate the record citations on which Westgate relies.

Westgate also points to Johns' testimony that, when he expressly asked the Wesley representative whether he "would continue to pay Westgate," the representative told him that he was not yet a client yet, so she could not advise him, but that a "resolution specialist" would walk him through the process. (Doc. No. 286-5, at 18.) Johns' initial reaction was that it "made more sense to just keep the timeshare than to pay all those fees to Wesley and Westgate and risk [his] credit." (*Id.*) In response, the Wesley representative assured him that he "needed to be looking at the big picture cost savings with Wesley over the long run." (*Id.* at 18–19.) In another call, he was told: "if you hired Wesley then you could decide to stop making payments to Westgate and just let the resolution specialist know so they can handle it appropriately." (*Id.* at 24.)

Yet another Westgate owner stopped making payments to Westgate months before she engaged Wesley. Another owner testified that she "thought it was okay to stop paying Westgate because the Wesley representative told [her] to," that "paying Wesley monthly would be cheaper than paying Westgate," and that Wesley told her to stop paying Westgate. (Doc. No. 265-36, at 14–15.) She also testified, however, that she stopped paying Westgate because she "couldn't afford it anymore." (*Id.* at 21.) Another customer to whom the parties point was told by a Wesley representative that "he could not direct [her] to stop paying Westgate," but, if she continued to pay Westgate, Westgate would have no incentive to "let [her] out of [her] timeshare." (Doc. No. 286-6, at 6.) She was also told, and believed, that "stopping payments to Westgate would not constitute a legal default on [her] payment obligation." (*Id.* at 7.) After she became a Wesley client, she never made another payment to Westgate. (*Id.* at 9–10.) However, she also testified that the reason she stopped paying Westgate was "because it's a rip off." (*Id.* at 10.) Another owner testified that she stopped paying Westgate "way before [she] had to deal with Wesley . . . [due] to the situation with [her] father." (Doc. No. 273-9, at 2, Rosario Dep. 60.)

It is undisputed that Westgate entered into a "Warranty Deed in Lieu of Foreclosure" with certain Westgate owners/Wesley customers who stopped paying their mortgages. However, Westgate denies that it *knowingly* accepted a deed in lieu of foreclosure from any Westgate owners who were also Wesley customers. In accepting a deed in lieu of foreclosure, Westgate released each such owner "from any and all claims of whatsoever kind arising out of the [owner's] Note and Mortgage (and all matters related thereto)"—including potential claims by Westgate for the payment of the outstanding mortgage balance associated with the timeshare—in exchange for reconveyance of the underlying timeshare interest, without going through the foreclosure process. (*See, e.g.*, Doc. No. 273-10.)

A Westgate representative, John Willman, was asked during his deposition to confirm that a spreadsheet he was shown during his deposition indicated that Westgate had resold 8,914 properties recovered from Wesley customers. (*See* Willman Dep. 122, Doc. No. 273-2, at 18.) While he did so confirm, his deposition testimony does not indicate how those resales related to Westgate's damages or mitigation of damages.

Wesley asserts that none of its advertisements actually instructs present or potential customers to stop making timeshare mortgage payments. (Wesley SUMF ¶ 12.) Westgate points out that some of Wesley's advertisements expressly emphasize such statements as "NO MORE Mortgage payment." (*See, e.g.*, Doc. No. 310-2 ¶ 196.)

It is undisputed that many of Wesley's customers deposed in this case could not recall which advertisements they saw before contacting Wesley, and none testified that they stopped making timeshare mortgage payments solely in reliance upon any statements made in Wesley's advertisements. It seems apparent, however, that seeing a Wesley advertisement prompted many Westgate customers to contact Wesley in the first instance. (*See, e.g.*, Rosero Dep. 31, Doc. No.

265-26, at 8 (explaining that, from the advertisement he heard on the radio, he believed he should hire Wesley to "get the timeshare out"); *see generally* Defs.' Resp. to Pl.'s Supp. Statement, Doc. No. 310-2.) At least some customers were influenced to call Wesley based on reviews appearing on the website maintained by the Better Business Bureau ("BBB") and similar websites. (*See, e.g.*, Jauregui Dep. 29, Doc. No. 265-28, at 6.)

One customer also testified that she did not believe that Wesley did anything to earn its fee, but, when she asked Wesley to cancel the remaining payments she owed on her contract with Wesley, Wesley agreed to forgive the remaining payments only if she agreed to provide a positive review for Wesley online. (*Id.* at 165, Doc. No. 265-28, at 57.) The review had to follow Wesley's guidelines and be approved by Wesley. The customer did not think Wesley deserved a positive review and felt like she was being asked to lie in exchange for forgiveness of the remainder owed on her contract, but she did it anyway. (*Id.* at 168–69, Doc. No. 265-28, at 60–61.) In addition, it is undisputed that, in 2019, the BBB suspended and then revoked Wesley's accreditation based on, inter alia, an "extensive analysis" of Wesley reviews left on the BBB's website that revealed a "patten of suspect reviews" that the BBB determined violated its policies. It is also undisputed that the BBB determined Wesley violated the BBB's standards relating to honesty, transparency, and integrity. (Doc. No. 310-2 ¶ 207.) Wesley concedes that it does not disclose to customers that it pays customers to leave reviews or testimonials or that it hides or conceals customer reviews that it does not like. (*Id.* ¶¶ 211, 212.)

As part of the sales process, Wesley sends potential customers a link to testimonial videos, which the potential customers are required to watch before having a call with a Wesley vice president. Wesley wants customers to rely on those testimonials or reviews when deciding to hire Wesley. Several Westgate owners testified that they reviewed video testimonials and/or on-line

reviews and that they believed that the testimonials were legitimate and accurate. Several owners indicated that positive reviews and BBB certification were important to their decision to hire Wesley.

Wesley's corporate representative, Katie Neher, testified that any credit-repair services provided during the relevant time period were actually performed by non-parties Credit Guru and Wesley Credit Repair, LLC, not by Wesley *per se*. (Neher Dep. 41–42, Doc. No. 272-3, at 2–3.) Neher testified that Wesley had an "in-house credit team" responsible for "[s]ending people to whatever credit . . . company they're signing up to." (*Id.* at 42, Doc. No. 272-3, at 3.) Regardless, there is substantial evidence in the record indicating that Wesley's salespeople told potential customers that Wesley "will provide credit repair" for any customer who stopped making timeshare mortgage payments. (*See, e.g.*, Doc. No. 265-5, at 31, 102; Doc. No. 289-1 ¶ 184(i).)

On July 1, 2020, eight months after filing suit, Westgate began requiring all Westgate owners seeking to use Westgate's "voluntary relinquishment program" to terminate a timeshare obligation to execute an affidavit stating that they are not working with a third-party timeshare exit company, such as Wesley. Wesley has encouraged people to lie on these affidavits, stating that they are not working with a third party, and to continue working with Wesley. (*See, e.g.*, Boswell Dep. 93–101, Doc. No. 265-41, at 24–32.)

**B.      Discussion**

*1.      Whether to Dismiss the FDUTPA Claim*

*a)      Background*

Westgate filed this lawsuit in the United States District Court for the Middle District of Florida, Orlando Division, on October 17, 2019. The original Complaint named only Wesley as a defendant and asserted claims for (1) false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a); and (2) violation of Florida's Deceptive and Unfair Trade Practices Act. (Doc. No. 1.)

Westgate claimed federal question jurisdiction, asserted that the exercise of personal jurisdiction over Wesley would not "violate traditional notions of fair play and substantial justice," and also claimed that venue in the Middle District of Florida was proper under 28 U.S.C. § 1391. (*Id.* ¶¶ 24, 28, 29.)

The parties then spent the next seven months conducting jurisdictional discovery and litigating the question of whether Wesley was subject to personal jurisdiction in Florida. On June 5, 2020, the parties entered a Joint Stipulation to Transfer Action, in which the parties jointly requested that the Florida district court transfer the case pursuant to its "authority under 28 U.S.C. § 1404(a)." (Doc. No. 55, at 1.) The case was transferred to this court in accordance with that request, and Wesley's then-pending Motion to Dismiss for Lack of Personal Jurisdiction or, Alternatively, Motion to Transfer Venue (Doc. No. 19) was denied as moot (Doc. Nos. 56, 57).

Westgate filed its first Amended Complaint shortly after transfer, adding Wesley's CEO, Charles McDowell, as a defendant and adding a claim under the Tennessee Consumer Protection Act. (Doc. No. 104.) In response, the defendants filed a Motion to Dismiss the TCPA claim, arguing generally that it was inadequately pleaded and that Westgate, not being a consumer, lacked standing to bring a claim under the TCPA. (Doc. Nos. 105, 106.) The court denied the motion. (Doc. No. 136.) Westgate was permitted to file its Second Amended Complaint in October 2021, incorporating new facts learned in discovery. (Doc. No. 173.) It was permitted to file the TAC in March 22, 2022, this time amending the pleading by omitting the Lanham Act claim and bolstering the allegations regarding all of the individual plaintiffs' citizenship, in order to establish diversity jurisdiction, since it had abandoned its sole federal claim. (Doc. No. 217.) As a result, only the FDUTPA and TCPA claims now remain pending.

Wesley now seeks summary judgment on the FDUTPA claim. It argues that Westgate cannot pursue claims under the consumer protection laws of two different states at the same time and that the court must perform a choice of law analysis to determine which state's law governs this case. Wesley asserts that the case is governed by Tennessee law and, consequently, that the FDUPTA claim must be dismissed. It argues in the alternative that, should the court find that Florida law governs this action, the TCPA claim should be dismissed instead. Westgate argues in response that a choice of law analysis is not appropriate; that its FDUTPA and TCPA claims should both go to trial, after which, if necessary, Westgate would make an election of remedies; that it has standing to assert both FDUTPA and TCPA claims; and that the claims involve separate theories of liability. (Doc. No. 286-1, at 26.) It also argues that, even if the court conducts a conflicts of law analysis, it should conclude that "all claims should proceed." (*Id.*)

The fact that, as Westgate points out, the FDUTPA and the TCPA are not entirely consistent simply underscores the point that the court must undertake a choice of law analysis. And Westgate provides no legal support for its assertions that it has "standing" to bring claims under both the FDUTPA and the TCPA at the same time or that the laws of both Florida and Tennessee can apply to its consumer protection claims. In fact, those cases that have considered similar arguments have uniformly rejected them. *See, e.g.*, *Cimoli v. Alacer Corp.*, 587 F. Supp. 3d 978, 988 (N.D. Cal. 2022) ("Choice of law requires determining the single state's substantive law that applies to a particular plaintiff's claims. Accordingly, [the plaintiff] cannot bring claims under California and Pennsylvania's unfair competition laws at the same time." (citations omitted)); *Lipman Bros. v. Apprise Software, Inc.*, No. CIV.A. 13-4439, 2015 WL 4476983, at *9 (E.D. Pa. July 22, 2015) ("Finally, the TCPA claim fails because Pennsylvania law applies."); *Bulldog New York LLC v. Pepsico, Inc.*, 8 F. Supp. 3d 152, 162 (D. Conn. 2014) (finding that the

question of whether New York or Connecticut law applied governed whether the plaintiff could bring a claim under the Connecticut Uniform Trade Secrets Act); *ADT LLC v. Vision Sec., LLC*, No. 13-81197-CV, 2014 WL 3764152, at *7 (S.D. Fla. July 30, 2014) ("When a district court determines that Florida law does not apply, a plaintiff lacks standing to bring a suit under the FDUTPA."); *Diamond Aircraft Industries, Inc., v. Horowitch*, 107 So.3d 362, 369 (Fla. 2013) (recognizing that "[t]he application of the law of another jurisdiction negates [the plaintiff's] FDUTPA claim"). The court, in short, must decide which state's laws apply, and it cannot be both.

### b)    Florida's Choice of Law Rules Apply

Generally, "a federal court sitting in diversity borrows the forum State's choice-of-law rule." *Cassirer v. Thyssen-Bornemisza Collection Found.*, 142 S. Ct. 1502, 1509 (2022) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). That general rule may be tweaked, however, when a case has been transferred to a different state from the one in which it originated. In particular, when a case is transferred under 28 U.S.C. § 1406, the choice of law rules of the *transferee* court are applied. *Nelson v. International Paint Co.*, 716 F.2d 640, 643 (9th Cir. 1983). If, on the other hand, a case is transferred pursuant to 28 U.S.C. § 1404(a), the choice of law rules that would have been applied by the *transferor* court—here, Florida—are applied. *Ferens v. John Deere Co.*, 494 U.S. 516, 525 (1990); *In re Dow Corning Corp.*, 778 F.3d 545, 550 (6th Cir. 2015). As set forth above, the parties stipulated to the transfer of this case under § 1404(a), so Florida's choice of law rules govern.

### c)    Choice of Law Principles

Under Florida law, before embarking on a choice of law analysis, a court should first determine whether a "true" conflict of laws exists. *Tune v. Philip Morris, Inc.*, 766 So. 2d 360, 352 (Fla. Dist. Ct. App. 2000). A "false conflict" between laws can exist, for example, where the laws of the different states are the same. *Est. of Miller ex rel. Miller v. Thrifty Rent-A-Car Sys., Inc.*,

609 F. Supp. 2d 1235, 1244 (M.D. Fla. 2009). Conversely, "a true conflict exists when two or more states have a legitimate interest in a particular set of facts in the litigation and the laws of those states differ or would produce a different result." *Id.* (citing *Tune*, 766 So. 2d at 352).

In this case, both the FDUTPA and TCPA are directed toward the protection of consumers from deceptive and unfair practices, and both are expressly intended to be "interpreted and construed consistently with the interpretations given by the federal trade commission and the federal courts pursuant to § 5(A)(1) of the Federal Trade Commission Act, codified in 15 U.S.C. § 45(a)(1)," Tenn. Code Ann. § 47-18-115; *accord* Fla. Stat. Ann. § 501.204(2) ("[I]n construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1)."). The two statutory schemes contain significant differences, however. As Westgate points out, the TCPA provides that it is a violation to "advertise, promote, sell or offer for sale any good or service that is illegal or unlawful to sell in the state." Tenn. Stat. § 47-18-104(b)(43)(C). Westgate asserts that Wesley has violated this provision by engaging in the unauthorized practice of law, offering credit repair services in violation of the Tennessee Credit Services Business Act and the Credit Repair Organizations Act, 15 U.S.C. § 1679 *et seq.*, and offering debt management services in violation of the Tennessee Uniform Debt Management Services Act. Westgate asserts that such conduct violates the TCPA, irrespective of whether it is deceptive and unfair, but it is unlawful under the FDUTPA only if the same conduct was deceptive and unfair. *See* Fla. Stat. § 501.204. In addition, under Florida law, all deceptive and unfair trade practices are unlawful, *see id.*, while the TCPA enumerates acts and practices deemed to be unlawful, *see* Tenn. Code Ann. § 47-18-104(b)(1)–26), (b)(28)–(62). *See also id.* § 47-18-104(b)(27) ("Engaging in any other act or practice which is deceptive to the

consumer or to any other person [is declared to be unlawful]; provided, however, that enforcement of this subdivision (b)(27) is vested exclusively in the office of the attorney general and reporter[.]"). In other words, while there is substantial overlap between the two statutory schemes, it is at least "theoretically possible to establish a violation of one statute and not the other," as Westgate recognizes. (Doc. No. 286-1, at 28.) The court finds, therefore, that a choice of law analysis is required. *Accord In re Actiq Sales & Mktg. Pracs. Litig.*, 790 F. Supp. 2d 313, 321 (E.D. Pa. 2011) (finding an "actual conflict" between the consumer protection afforded by the Indiana Deceptive Consumer Sales Act and Pennsylvania Unfair Trade Practices and Consumer Protection Law, requiring it to make a choice of law analysis).

For tort claims, such as those at issue here, Florida applies the "most significant relationship" test of the Restatement (Second) of Conflicts of Laws § 145. *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007) (citing *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980)). Section 145(1) lays out the basic principle for tort actions, and section 145(2) lists four "contacts" that courts should consider in the course of applying the specific Choice of Law Principles under section 6, as follows:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.[4]

---

[4] Section 6 of the Restatement provides:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

> (a) the place where the injury occurred,

> (b) the place where the conduct causing the injury occurred,

> (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and

> (d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflicts of Laws § 145. The Restatement advises that "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.*

Comment (f) to § 145 notes that the "relative importance of the contacts [enumerated in § 145(2)] varies somewhat with the nature of the tort involved." More specifically:

> place of injury is of particular importance in the case of personal injuries and of injuries to tangible things . . . . On the other hand, the place of injury is less significant in the case of fraudulent misrepresentations . . . and of such unfair competition as consists of false advertising and the misappropriation of trade values. The injury suffered through false advertising is the loss of customers or of trade. Such customers or trade will frequently be lost in two or more states. The effect of the loss, which is pecuniary in its nature, will normally be felt most severely at the plaintiff's headquarters or principal place of business. But this place may have only a slight relationship to the defendant's activities and to the plaintiff's loss of customers or trade. The situation is essentially the same when misappropriation of the plaintiff's trade values is involved, except that the plaintiff may have suffered no pecuniary loss but the defendant rather may have obtained an unfair profit. For all these reasons, the place of injury does not play so important a role for choice-of-law purposes in the case of false advertising and the misappropriation of trade values as in the case of other kinds of torts. Instead, the principal location of the defendant's conduct is the contact that will usually be given the greatest weight in determining the state whose local law determines the rights

---

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6.

and liabilities that arise from false advertising and the misappropriation of trade values.

*Id.* § 145 cmt. f.

In applying these principals in *Grupo Televisa*, the Eleventh Circuit accorded little weight to the place were the plaintiff's injury occurred (Mexico) and held that the law of the state in which the defendant's tortious conduct allegedly occurred (Florida) should be applied to a claim for tortious interference with contract brought by a Mexican television production company. *Grupo Televisa*, 485 F.3d at 1246–47.

Likewise, in a case in which several Florida companies that own and operate nuclear power plants brought suit in Florida against the Nuclear Energy Institute, asserting, among other claims, a violation of the FDUTPA, the defendant sought dismissal of the FDUTPA claim on the basis that, because the law of the District of Columbia applied, the plaintiffs could not pursue a claim under the FDUTPA. *Fla. Power & Light Co. v. Nuclear Energy Inst., Inc.*, No. 18-CV-80118, 2018 WL 3089341, at *4 (S.D. Fla. May 10, 2018). The court rejected the plaintiffs' argument that Florida law applied to their tort claims simply because they were based in Florida and their injury occurred in Florida. Instead, the court noted that, "[w]hen the plaintiff claims 'unfair competition,' the court should 'give[] particular weight' to the place where the conduct causing the injury occurred." *Id.* (quoting *ADT LLC v. Vision Sec., LLC*, No. 13-81197-CV, 2014 WL 3764152, at *6 (S.D. Fla. July 30, 2014), and citing Restatement (Second) of Conflict of Laws § 145 cmt. f). The allegedly tortious conduct at issue took place in D.C. *Id.* In addition, the plaintiffs' claims were based on a written agreement that specified that it was to be enforced under D.C. law, and the existence of this agreement made it clear that the parties' relationship was centered in D.C. Weighing these factors and according particular weight to the place where the allegedly tortious conduct occurred, the court found that D.C. law applied. And, because D.C. law applied, the court

dismissed the FDUTPA claim. *Id.*; *accord Bulldog New York LLC v. Pepsico, Inc.*, 8 F. Supp. 3d 152, 162 (D. Conn. 2014) (in a trade secrets misappropriation case, citing § 145(2) and comment (f) to find that the place where the allegedly tortious conduct occurred should be accorded greater weight than the place where the injury occurred).

<em>d)</em>      <em>Application of § 145 and Comment (f) to This Case</em>

The place where the injury occurred in this case is Florida, as that is where the plaintiffs are located and where the economic impact of the defendants' alleged wrongful conduct is felt. *Accord Bulldog New York LLC*, 8 F. Supp. 3d at 162. This factor weighs in favor of applying Florida law.

However, the place where the conduct causing the injury occurred is Tennessee, where Wesley's offices and employees are located, its policies and procedures are formulated, and the contacts with Westgate owners originated. This factor weighs in favor of applying Tennessee law.

The third factor asks the parties' "domicil[e], residence, nationality, place of incorporation and place of business." Because this factor points equally to Florida and Tennessee, it is neutral. The fourth factor has no relevance, because the parties have no direct relationship other than the one forged through the pursuit and defense of this lawsuit.

The question, then, is how to weigh the first two factors. Under ordinary circumstances, the place where a plaintiff's injury occurs would be accorded substantial weight and would tilt the analysis in favor of that state's laws. In this case, however, the considerations at issue in Restatement § 145 comment (f) apply. Although Westgate's claims are brought under the Florida and Tennessee consumer protection acts, the claims, at their core, incorporate allegations of conduct that constitutes misrepresentation, the unauthorized practice of law, interference with business relations, false advertising, and the like. And, as in cases involving claims of unfair competition, trade secrets misappropriation, false advertising, and misrepresentation, the actual

injury allegedly inflicted by Wesley occurred nationwide, as Westgate has timeshare properties located nationwide, and the timeshare owners who became Wesley customers are widely disseminated. *Accord ADT LLC*, 2014 WL 3764152, at *7 ("Although as pure economic loss, the injury most likely occurred in ADT's headquarters in Florida, the injury also occurred where ADT alleged it lost customers, such as Texas, California, and Virginia."); *see id.* at *6 ("The Restatement gives greater weight to the place of conduct rather than the place of injury because economic injury for unfair competition will usually occur in more than one state." (citing Restatement (Second) of Conflict of Laws § 145 cmt. f.)).

The Restatement directs that the place where the allegedly tortious conduct occurred should be accorded greater weight than the place where the injury occurred in a case such as this one, where the injury is purely economic and the "plaintiff's headquarters or principal place of business [has] only a slight relationship to the defendant's activities and to the plaintiff's loss of customers or trade." Restatement (Second) of Conflict of Laws § 145 cmt. f. With the third and fourth factors enumerated in § 145(2) being neutral or irrelevant, and the place of the injury being of less importance here than the place where the allegedly tortious conduct occurred, the § 145(2) factors weigh in favor of applying Tennessee law to Westgate's claims.

In addition, with regard more generally to the Restatement § 6 considerations, although Florida would have a substantial interest in seeing that its laws were applied to protect *consumers* within that state, Westgate is not a consumer, and Tennessee has an equally great interest in curbing tortious conduct by business entities headquartered in this state. The parties having jointly agreed to the transfer of this case to the Middle District of Tennessee, and there being little evidence that Wesley intentionally directed its activities to the State of Florida, the court finds that Tennessee has a greater interest than Florida in the resolution of the consumer protection act claims in this

particular case. *Accord Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1, 31–32 (D.D.C. 2019) (applying D.C. law to the plaintiffs' consumer protection act claims, even though the plaintiffs' alleged injuries occurred in Louisiana or Florida, in light of the facts that "the alleged misconduct emanated from District of Columbia, where the defendants are headquartered and have their primary place of business," the case "involve[d] allegations of misrepresentation, for which the place of the alleged injury is less important than in other tort cases," and D.C. had an "interest in regulating companies incorporated under its laws").

Finding that Tennessee law applies to this case, the court will grant that portion of Wesley's summary judgment motion seeking dismissal of the FDUTPA claim.[5]

### 2. Evidence of Damages

Wesley next asserts that the only damages claimed by Westgate arise from the cessation of mortgage payments by approximately 2,025 Westgate owners who became Wesley customers. Wesley argues that Westgate cannot prove that the cessation of these mortgage payments was actually *caused* by Wesley's conduct, unless Westgate deposed those owners and obtained direct evidence from each regarding why they stopped making mortgage payments. Westgate, however, only deposed fifty-five customers, and only twenty-two of those were identified as customers who had mortgages on their timeshares and stopped making payments on them after contact with Wesley.[6] Wesley argues, in short, that Westgate cannot prove that Wesley's conduct was the proximate cause of the claimed damages arising from the other 2,000 customers' cessation of mortgage payments. (*See* Doc. No. 273, at 8 ("[I]n the absence of testimony from or some other

---

[5] It is not entirely clear that the selection of Tennessee law over Florida law will have any real impact on the outcome of this case, but, in any event, eliminating the FDUTPA claim substantially simplifies and streamlines the resolution of the remaining issues.

[6] Wesley explains that the other deponents did not have mortgages on their timeshares. (*See* Doc. No. 273, at 4 n.2.)

admissible evidence relating to each former owner explaining why he or she stopped making payments, Plaintiffs cannot meet their burden of establishing that Wesley proximately caused the missed payments Plaintiffs seek to recover to the exclusion of other factors (such as the timeshare owner's preexisting dissatisfaction with Plaintiffs, the timeshare owner's finances, the timeshare owner's conversations with third parties, etc.).").)

The court is not persuaded at this juncture that Westgate was obligated to depose over 2,000 timeshare owners to verify why they stopped their mortgage payments and further finds that the close temporal proximity between a timeshare owner's contact with Wesley and that customer's cessation of mortgage payments constitutes circumstantial evidence of the requisite causal connection between those events. Moreover, even for those timeshare owners who were already unhappy with Westgate and who claim that they made their own decision to stop their mortgage payment, a reasonable jury could conclude that they were nonetheless influenced by Wesley's alleged promises that they could stop payments legally and that they would not suffer any adverse credit consequences. As another court has found under similar circumstances, "a person's *willingness* to breach a contract is not the same as a *predisposition* to do so. In the end, all [the evidence in the record] shows is that, prior to the Marketing Defendants' intervention, the owners did not know, and had not considered, that refusing payment to [the plaintiff] was a potential way to be released from their timeshare obligations." *Bluegreen Vacations Unltd., Inc. v. Timeshare Laws. P.A.*, No. 20-24681-CIV, 2023 WL 3198192, at *7 (S.D. Fla. May 2, 2023) (emphasis in original), *reconsideration denied*, No. 20-24681-CIV, 2023 WL 3435139 (S.D. Fla. May 12, 2023).[7]

---

[7] Wesley cites two cases from Florida in which the courts held, primarily with respect to claims for tortious interference with contract, that the plaintiff timeshare companies could not establish causation without deposition testimony from each of the timeshare owners who stopped

Clearly, Westgate will not be able to recover damages associated with timeshare owners who ceased making mortgage payments even before they had contact with Wesley. But otherwise, the evidence in the record is sufficient to constitute circumstantial evidence of a causal connection between Wesley's allegedly false and misleading statements to Westgate timeshare owners and the timeshare owners' cessation of mortgage payments and, thus, evidence of proximate cause between Wesley's alleged conduct and Westgate's alleged damages. A material factual dispute precludes summary judgment for Wesley on this issue.

3. *The Motion for Summary Judgment Relating to Discrete Allegations of TCPA Violations*

Next, Wesley argues that Westgate is not entitled to damages or injunctive relief in connection with "alleged conduct that has not caused plaintiffs any damages or injury-in-fact." (Doc. No. 273, at 13.) More specifically, Wesley insists that Westgate is not entitled to damages or an injunction in connection with (1) its advertisements, since no Westgate owner testified that he or she stopped making mortgage payments solely as a result of seeing a Wesley advertisement; (2) Wesley's alleged violation of the Tennessee Uniform Debt-Management Services Act or Tennessee Credit Services Business Act, since there is no evidence that these violations "caused damage to plaintiffs"; (3) Wesley's ghostwriting letters to Westgate for Westgate owners or impersonating Westgate owners in telephone calls with Westgate, because there is no evidence that this conduct damaged Westgate or that Westgate changed its position as a result of these

---

making mortgage payments as a result of interference from the defendant timeshare exit companies. *See Wyndham Vacation Ownership, Inc. v. Sussman*, No. 6:18-cv-2171-GAP-DCI, 2021 WL 4949162 (M.D. Fla. Sept. 27, 2021); *Westgate Resorts, Ltd. v. Sussman*, No. 6:17-cv-1467-Orl-37DCI, 2019 WL 3848805 (M.D. Fla. July 26, 2019). Although *Wyndham* also concerned a FDUTPA claim as well, this court is not persuaded by the Florida court's application of the same rationale for dismissal of the tortious interference claim to the FDUTPA claim.

practices; and (4) Wesley's efforts to "assist" Westgate owners who do not carry a mortgage and, therefore, who did not stop mortgage payments because of Wesley.

Relatedly, Wesley argues that, for many timeshare owners who stopped making their mortgage payments, Westgate "voluntarily waived [its] right to recover payments on the outstanding mortgage[] balances by entering into a 'Warranty Deed in Lieu of Foreclosure.'" (Doc. No. 273, at 12.) In this transaction, the timeshare owner reconveys the underlying timeshare interest to Westgate, and Westgate releases the owner from any claims related to the Promissory Note or Mortgage, but without going through a formal foreclosure process. Wesley asserts that, in entering into these transactions, Westgate fails to mitigate its damages "by voluntarily waiving [its] right to receive payment from the party who originally owed [it] this money in exchange for valuable consideration." (*Id.*) Wesley then argues that, in many of these cases, Westgate succeeds in reselling the recuperated timeshare interest to another customer. Wesley argues that Westgate should not be entitled to damages in connection with any owner who received a deed in lieu of foreclosure.

The court is not persuaded. Regarding the deeds in lieu of foreclosure, offering a deed in lieu of foreclosure likely would qualify as an attempt to mitigate damages, as would the reselling of the properties on which the owners defaulted. Moreover, whether Westgate failed to mitigate damages would be an issue that might result in a reduction of damages, but that is not the basis for Wesley's motion. Nor has Wesley offered any reason to conclude that Westgate waived its right to damages arising from the borrowers' defaults.

Similarly, although the evidence presented to the court does not suggest that any of the above-referenced allegedly deceptive practices, standing alone, caused Westgate's customers to breach their timeshare agreements and mortgages, it does suggest, as Westgate argues, that the

entirety of Wesley's scheme—including misleading advertisements that caused individuals to contact Wesley in the first place, the implicit characterization of Wesley's services as legal in nature in telephone calls with Wesley representatives, the promises of credit repair services, telling customers that they can legally stop paying their mortgages, and so forth—influenced Westgate owners' decisions to cease making mortgage payments.[8] Westgate is not seeking damages related to each of the allegedly deceptive practices individually. It brings a single claim for violation of the TCPA giving rise to alleged damages. Wesley does not cite to any caselaw that would bar Westgate from introducing evidence of the entirety of Wesley's alleged scheme or from submitting to the jury the question of whether Westgate has adequately proved causation.

Wesley is not entitled to summary judgment with respect to Westgate's allegations of damages arising from Wesley's alleged violation of the TCPA.

### 4. The Scope of Available Injunctive Relief

Finally, Wesley seeks partial summary judgment on the scope of injunctive relief available to Westgate. It asserts that it is entitled to summary judgment to the extent Westgate seeks injunctive relief that would "restrict Wesley's business practices as they relate to timeshare companies other than Westgate and customers who own non-Westgate timeshares." (Doc. No. 273, at 26; *see id.* at 29 ("Accordingly, Wesley respectfully requests partial summary judgment as it relates to Plaintiffs' request for injunctive relief regarding Wesley's practices with respect to customers who own timeshares sold by other developers who are not parties to this action.").)

---

[8] Wesley argues that some of the conduct that Westgate challenges, such as impersonating Westgate owners and ghostwriting letters for Westgate owners only occurs after the owners have stopped making mortgage payments and, therefore, cannot be deemed to harm Westgate, as the alleged damage has already happened. Westgate responds, however, that Wesley's deceptive conduct induces Westgate to engage with Wesley—thinking that it is dealing directly with an owner—and to make concessions (including, sometimes, by accepting the return of the timeshare) that it would not make if it knew it was dealing with a timeshare exit company.

Westgate does not specifically respond to this argument, other than to assert that, to be entitled to an injunction, it "needs only to show that it is aggrieved or affected, which is defined broadly and is something less than demonstrating damages." (Doc. No. 286-1, at 7044.) More generally, it argues that Wesley's allegedly misleading advertisements, purchased reviews, violations of the TUDMSA and TCSBA, its impersonation of Westgate owners when communicating with Westgate, and its "supposed services for zero debt [Westgate] customers" all harm Westgate. (*See generally id.* at 14–21.)

The TAC indeed seeks very broad relief, insofar as it asks the court to enjoin Wesley from "engaging in false and misleading advertisements," "providing unauthorized legal services," and "engaging in knowingly unlawful, fraudulent, false, or deceptive practices." (Doc. No. 217 ¶ 134(a)(i)–(ii), (xvii).) Nearly all of the other requests for an injunction, however, specifically request that Wesley be enjoined from engaging in some specific conduct vis-à-vis "customers" without necessarily limiting the term to the subset of Wesley customers who are also Westgate timeshare owners—for example, "leading customers to believe Wesley has vetted the customer's claim, if any, that the timeshare seller wronged them in connection with the timeshare purchase," and "leading customers to believe that any claimed wrongful conduct by the timeshare seller in connection with the timeshare purchase is what justifies stopping payments for the timeshare." (*Id.* ¶ 134(a)(iii)–(iv).)

Whether to grant injunctive relief is an equitable matter that falls within the district court's discretion. *Howe v. City of Akron*, 801 F.3d 718, 752 (6th Cir. 2015). Before a court may grant a permanent injunction, the plaintiff must show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy

in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

At the same time, a permanent injunction, is an "extraordinary" equitable remedy that does not "issue[] as a matter of course." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982). The Sixth Circuit has recognized that, "[w]hile district courts are not categorically prohibited from granting injunctive relief benefitting an entire class in an individual suit, such broad relief is rarely justified because injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Sharpe v. Cureton*, 319 F.3d 259, 273 (6th Cir. 2003) (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); A*luminum Workers Int'l Union Local Union No. 215 v. Consol. Aluminum Corp.*, 696 F.2d 437, 446 (6th Cir. 1982) ("Precisely because equitable relief is an extraordinary remedy to be cautiously granted, it follows that the scope of relief should be strictly tailored to accomplish only that which the situation specifically requires and which cannot be attained through legal remedy.")

Although Wesley's Motion for Partial Summary Judgment does not identify precisely how it thinks the plaintiff's request for injunctive relief should be tailored, the court agrees that, if Westgate establishes that it is entitled to a permanent injunction, the scope of any such injunction must be narrowly tailored by focusing specifically on the conduct of Wesley and its employees in their interactions with Westgate owners. Accordingly, Wesley's motion will be granted, insofar as any injunction issued will be limited in scope to conduct directed to Westgate owners only.

## III.    MCDOWELL'S MOTION FOR SUMMARY JUDGMENT

As set forth above, McDowell argues that he is entitled to summary judgment on all claims against him, because an individual cannot be liable under the FDUTPA or TCPA unless he directly participates in the allegedly deceptive conduct that proximately caused the plaintiff's harm and

there is no evidence of his direct participation in the alleged scheme. (Doc. No. 274.) McDowell, in the alternative, adopts and incorporates Wesley's arguments.

Because the court has determined, as discussed above, that Tennessee substantive law applies to this case, McDowell's motion will be granted as to the FDUTPA claim, without further discussion, and that claim will be dismissed. As set forth below, the motion will be denied as to the TCPA claim.

### A.    Facts Relevant to McDowell's Motion

McDowell is the highest ranking person at Wesley and, as such, has "the final say." (Doc. No. 380, McDowell Dep. 30.[9]) He testified that he is not actively involved in setting company policy but instead "tr[ies] to set the culture and the tone" for the company. (*Id.*) He also stated that he tries "to hire really good people and put them around me and let them do their job, and I look over their shoulder all day." (*Id.*) He was not asked to explain what he meant by looking over his employees' shoulders all day, and the statement, insofar as it is generally understood to imply active involvement, conflicts with his claims not to have been actively involved in setting company policies or directing the sales, marketing, and other business activities of Wesley on a day-to-day basis for several years. In any event, it is undisputed that he started the company, initially came up with the "three-call qualification process," and "originally taught qualifications specialists how to implement" the three-call qualification process. (Doc. No. 310-2 ¶¶ 230, 231.)

Westgate has not pointed to any evidence in the record establishing that McDowell communicated directly with any Westgate owners who stopped paying their mortgages after becoming Wesley customers, that McDowell was directly engaged in overseeing the activities of

---

[9] At the court's request, the parties have filed a complete copy of McDowell's deposition transcript, the original pagination of which is consistent with the pagination assigned by the court's electronic filing system.

the sales representatives (whom Wesley accords the title "vice president") who interacted with the Westgate owners, or that he personally instructed any Wesley employees to use deceptive practices in their interactions with prospective customers. However, the evidence indicates that McDowell originally devised the "scheme" that Westgate characterizes as fraudulent and misleading and that he is generally aware of, and approves, the process used by Wesley employees to assist timeshare owners, including Westgate owners, in divesting themselves of their timeshare interests. (*See generally* McDowell Dep. 105–06, 135.)

In addition, McDowell's own testimony establishes that, while he chooses to describe the company's role as "writing letters" to assist customers in cancelling their timeshares (*see, e.g.*, McDowell Dep. 47, 72, 178, 209), and he repeatedly testified that Wesley's policy is to only accept as customers those people who were lied to by the timeshare company in the course of the timeshare company's sales process (*see, e.g.*, *id.* at 72, 108, 142, 155), he also clearly knows that whether a customer claims to have been lied to has nothing to do with whether the timeshare will be cancelled and that Wesley's letter-writing campaign has had no effect on Westgate's decision whether to cancel a timeshare. Confronted with his knowledge of Westgate's past responses to letter-writing and complaints, he repeatedly stated only that he could not know what Westgate might do tomorrow and that he continued to hope that Westgate would "start doing the right thing" some day. (*See, e.g.*, *id.* at 175, 176; *see also id.* at 151 (acknowledging that, in his experience, if a customer continues to pay, Westgate will never cancel the timeshare).) He denied that Wesley instructs people to stop making their timeshare payments, but he readily acknowledged that Wesley's (and his) policy is to encourage people not to continue to pay. (*See, e.g.*, *id.* at 153 ("It's not our job to tell somebody to not pay a bill that they signed to pay. It's our job – when I speak with someone I would say, If I bought something that I absolutely know that they blatantly lied to

me, I wouldn't pay for it. I can't tell you what to do. I can tell you if you don't pay it, we're going to get it canceled a lot faster than if you do. But that's your call, that's not my call.").)

At the time of his deposition, McDowell was paying himself a salary from Wesley of $100,000 per week.

## B. Discussion

Westgate seeks to hold McDowell personally liable for the alleged TCPA violation. McDowell asserts that he is entitled to summary judgment, because there is no evidence that he was personally involved in any conduct that could be deemed a proximate cause of harm to the plaintiff. To be clear, Westgate does not allege that McDowell is liable as an alter ego of Wesley, nor does it contend that the corporate veil should be pierced.

As a general rule, under Tennessee law, "a corporate officer is only personally liable for torts in which he or she participated in the wrong." *Menuskin v. Williams*, 145 F.3d 755, 762 (6th Cir. 1998) (citing *Cooper v. Cordova Sand & Gravel Co.*, 485 S.W.2d 261, 271–72 (Tenn. Ct. App. 1971)). Limited liability companies are treated identically to corporations in that respect. *See* Tenn. Code Ann. § 48-217-101(1) & (3) (stating that, except in circumstances not applicable here, members, managers, governors, and agents of an LLC do not have any personal liability for the tort obligation of an LLC, except "by reason of such person's own acts or conduct");[10] *Hatfield v.*

---

[10] The Tennessee Revised Limited Liability Company Act, Tenn. Code Ann. § 48-249-101 *et seq.*, "made extensive revisions to the operation of LLCs in Tennessee and became effective on January 1, 2006." *Bridgeforth v. Jones*, No. M2013-01500-COA-R3-CV, 2015 WL 336376, at *24 n.18 (Tenn. Ct. App. Jan. 26, 2015). The revised Act applies to all LLCs formed after January 1, 2006, and to LLCs formed prior to that date if they expressly choose to be governed by the revised Act. *Id.* (citing Tenn. Code Ann. § 48-249-1002(b) ). Wesley was formed prior to 2006, but nothing in the record suggests that it has expressly elected to be governed by the revised Act. Although there is not a substantial difference between the provisions pertaining to individual liability of managers or directors in the Revised Act, *see* Tenn. Code Ann. § 48-249-114(a)(1)–(2), the court presumes that the original Act would apply to Wesley.

*Allenbrooke Nursing & Rehab. Ctr., LLC*, No. W2017-00957-COA-R3-CV, 2018 WL 3740565, at *30 (Tenn. Ct. App. Aug. 6, 2018) ("In general, a limited liability company exists separate and apart from its members in the same way that a corporation is separate from its shareholders."); *Johnson v. Tanner-Peck, L.L.C.*, No. W2009-02454-COA-R3-CV, 2011 WL 1330777, at *13 (Tenn. Ct. App. Apr. 8, 2011) (citation and internal quotation marks omitted) (applying rules regarding corporate separateness to a limited liability company).

The degree of involvement required by Tennessee courts for individual liability to be imposed on directors or managers for an entity's torts appears to be substantial. *See, e.g.*, *Hatfield*, 2018 WL 3740565, at *33 (setting aside jury verdict where there was insufficient evidence of the individuals' "active management of the facility . . . as evidenced by [their] involvement in day-to-day operations of the facility." (citation omitted)); *Menuskin*, 145 F.3d at 762 (dismissing fraud and TCPA claims, among others, against an individual corporate officer, where there was "no evidence to support the appellants' assertion that [she] was responsible for making the mortgage payments on the construction loans or that she personally made any affirmative misrepresentations to any of the appellants"); *Brungard v. Caprice Recs., Inc.*, 608 S.W.2d 585, 590 (Tenn. Ct. App. 1980) ("An officer or director of a corporation who commits or participates in the commission of a tort is likewise liable to third parties . . . ."). Although Tennessee caselaw in this area is scant, a leading treatise explains that

> [c]orporate officers, charged in law with affirmative official responsibility in the management and control of the corporate business, cannot avoid personal liability for wrongs committed by claiming they did not authorize and direct what was done in the regular course of that business, with their knowledge and with their consent or approval, or such acquiescence on their part as warrants inferring such consent or approval. However, more than mere knowledge may be required in order to hold an officer liable. The plaintiff must show some form of participation by the officer in the tort, or at least show that the officer directed, controlled, approved, or ratified the decision that led to the plaintiff's injury.

Fletcher Cyclopedia of the Law of Corporations ("Fletcher") § 1135 (Sept 2022 update).

Westgate asserts that individual liability may be imposed in this case, because McDowell "devised the scheme" employed by Wesley, "had control over all parts of the process," personally made the arrangements for Wesley to offer "illegal credit repair services," and has "actual knowledge of Wesley's deceptive and unfair conduct and has done nothing to stop it . . . , despite having the ability to do so." (Doc. No. 286, at 7.) He also clearly benefits from the alleged scheme, paying himself a salary of $100,000 per week.

The court finds, based on McDowell's own testimony, that there is a question of fact as to whether he may be personally responsible for the alleged TCPA violation, specifically insofar as the alleged TCPA violation is premised upon Wesley's policy and practice of inducing Westgate owners to stop making payments on their timeshare mortgages. McDowell testified repeatedly that it is not Wesley's place to instruct individuals to stop making payments on their mortgages, but he also agreed that he had no problem with, and specifically endorsed, Wesley employees' practice of telling prospective customers that it is the customer's choice whether to stop paying, but if they "don't pay, it's our experience that your timeshare will be canceled much quicker than if you continue to pay." (Wesley Dep. 151.) Despite being confronted with ample evidence to the contrary, McDowell continued to deny that Wesley's business model consisted of inducing prospective customers to stop paying their mortgage, repeatedly insisting that Wesley's goal was to get people's timeshares "canceled" and that it achieved this goal through writing letters (*id.* at 47, 72, 209), despite also acknowledging that, in his experience, the only way Westgate ever cancels a timeshare is through foreclosure or a deed in lieu of foreclosure when the customer gets sufficiently in arrears on mortgage payments. (*Id.* at 151; *see also id.* at 164–65 ("You [Westgate] don't even talk to them if they keep making their payment. Again, it's not my job to tell them to stop making a payment. They signed it. If they stop making a payment, we get them out

faster . . . ."), 171 ("I've never told anyone to stop making their payment to get out of a timeshare. . . . I wouldn't pay it. That's what I say.").)

Although it is unclear to what extent McDowell had knowledge of, or ratified, statements by salespeople and vice presidents about the availability of "in house" credit repair services as an inducement to stop payments, instructing Westgate owners to lie on sworn affidavits that they are not working with a timeshare exit company, and the other allegations Westgate makes, there is ample evidence in the record from which a reasonable jury could conclude that McDowell developed and endorsed the specific practice of telling people that, although Wesley cannot tell them what to do, if they stop making payments on their timeshares, Wesley can obtain a cancelation for them more quickly. There is also evidence from which the jury could conclude that McDowell has known all along that it is simply an owner's act of ceasing payments that will ultimately induce Westgate to foreclose or offer a deed in lieu of foreclosure.

In other words, with regard to Westgate's allegations regarding Wesley's practice of inducing Westgate owners to stop making mortgage payments through false and misleading statements, a jury could conclude that McDowell "directed, controlled, approved, or ratified the decision that led to the plaintiff's [alleged] injury." Fletcher § 1135. Consequently, McDowell is not entitled to summary judgment on the TCPA claim against him individually.

## IV. CONCLUSION

For the reasons set forth herein, both defendants' motions will be granted in part and denied in part. Both motions will be granted as to the claim under the FDUTPA, and that claim will be dismissed, on the basis that Tennessee law applies to this case. Further, any injunction entered in this case will be limited in scope to conduct directed to Westgate owners only. In all other respects, both motion will be denied.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge