# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| **WESTGATE RESORTS, LTD.,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-cv-00599** |
| | ) | **Judge Aleta A. Trauger** |
| **WESLEY FINANCIAL GROUP, LLC,** | ) | |
| **and CHARLES WILLIAM** | ) | |
| **McDOWELL, III,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM: WESTGATE'S MOTION FOR
## PARTIAL SUMMARY JUDGMENT

Now before the court is the plaintiffs' Motion for Partial Summary Judgment. (Doc. No. 263.) The plaintiffs—two Florida limited partnerships, thirteen Florida limited liability companies, and one Delaware limited liability company—are collectively engaged in the business of developing, financing, managing, and selling timeshare resort properties throughout the United States. (Third Amended Complaint ("TAC"), Doc. No. 217 ¶ 1.) All of the plaintiffs are affiliated and have "Westgate" in their name, and they are collectively referred to hereinafter, in the singular, as "Westgate" or "the plaintiff." Defendant Wesley Financial Group, LLC ("Wesley"), a Tennessee limited liability company, is in the business of helping timeshare owners get out of their timeshare obligations. Co-defendant Charles William ("Chuck") McDowell, III is Wesley's founder, CEO, and sole member. For the sake of simplicity, the defendants are referred to herein, in the singular, as "defendant" or "Wesley," unless necessary to distinguish between them.

The plaintiff brings claims against both defendants under Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* (the "FDUTPA") and the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.* (the "TCPA"). It seeks partial summary

judgment on several discrete issues in connection with both claims, and it also seeks a preliminary injunction barring Wesley from continuing to engage in certain business practices. Contemporaneously with this Memorandum, the court has ruled on the defendants' summary judgment motions, holding, as relevant here, that (1) this lawsuit is governed by Tennessee law, which requires dismissal of the FDUTPA claim; and (2) McDowell is not entitled to summary judgment on the TCPA claim asserted against him personally. Based on those holdings, the court will deny without analysis Westgate's Motion for Partial Summary Judgment as to its FDUTPA claim but will proceed to consider its arguments under the TCPA.

Generally, Westgate's TCPA claim is premised upon allegations that Wesley is engaged in a fraudulent "timeshare cancellation scheme with no legitimate foundation" that is "designed to induce" individuals who own timeshares through Westgate ("Westgate owners") to "breach their Purchase Agreements with, and related obligations to, Westgate." (Doc. No. 217 ¶ 51.) The scheme allegedly involves, among other things, engaging in false and misleading marketing claims and advertisements; providing unauthorized legal services or engaging in the unauthorized practice of law and leading Westgate owners to believe that they have a legal basis for cancelling their timeshare contracts; instructing Westgate owners to stop making payments on their timeshare mortgage while leading them to believe they have a legitimate legal basis for doing so; and leading customers to believe that any penalty for ceasing payments will be of little legal consequence or that Wesley will repair any credit damage or other consequence. Westgate seeks both damages and injunctive relief.

In support of its Motion for Partial Summary Judgment, the plaintiff has filed a supporting Memorandum of Law, proposed preliminary injunction, Statement of Undisputed Facts, and a Second Supplemental Statement of Facts.[1] The defendants responded to the motions and the statements of fact, with objections, and the plaintiff filed a Reply. As the court also noted in the context of the ruling on the defendants' dispositive motions, both parties have filed vast quantities of evidentiary material. As set forth herein, upon consideration of all of the parties' filings, the court will grant in part and deny in part Westgate's motion.

## I.  FACTS[2]

Westgate's Statement of Undisputed Facts ("SUF") contains 193 enumerated "facts," but 28 of these contain anywhere from 2 to 26 subparts. (Doc. No. 265-1.) The court, in fact, calculates that the SUF contains 569 separate statements of fact. The court's Local Rules authorize the filing of a "separate, *concise* statement of the material facts as to which the moving party contends there is no genuine issue for trial." L.R. 56.01(b) (emphasis added). Westgate's SUF is anything but concise, and its citations to the record are confusing at best. In particular, several of Westgate's statements in the SUF are supported only by cross-references to numerous *other* statements in the same document, making it enormously cumbersome for the court (or Wesley) to track down whether they are, in fact, supported by the record. (*See* SUF ¶¶ 6, 16, 19, 146, 165.) The court construes these purported statements of fact as consisting entirely of argument. In addition, although Westgate refers to the deposition transcript excerpts on which it relies by their original page numbers as assigned by the court reporter, many of the excerpts it filed as exhibits do not

---

[1] Westgate's first Supplemental Statement of Facts was filed in response to the defendants' separate summary judgment motions. (*See* Doc. No. 286-4.) Contemporaneously with this Memorandum, the court will deny Wesley's Motion to Strike Westgate's Second Supplemental Statement of Facts, but the court also has not substantially relied on it.

[2] The facts for which no citation is provided are drawn from the defendants' Response to Westgate's Statement of Undisputed Fact ("Def.'s Resp. SUF," Doc. No. 289-1) and are undisputed for purposes of Westgate's Motion for Partial Summary Judgment.

contain the originally assigned page numbers. (*See, e.g.*, L.W. Dep. excerpt, Doc. No. 265-40; C.J. Dep. excerpt, Doc. No. 286-5.)[3] That problem has been somewhat ameliorated by the filing (at the court's direction) of the complete transcript of McDowell's deposition, with page numbers (*see* Doc. No. 380), and the court has endeavored to the best of its ability to locate the other record citations on which Westgate relies. The court has also exercised its discretion to disregard those facts—asserted by either party—that are not properly supported or that do not appear to be material for purposes of this motion.[4]

### A. Overview

Wesley has existed in its current form since 2011 or 2012, and Chuck McDowell is the founder, sole owner, and highest ranking officer at Wesley. Wesley is not a law firm and does not employ any attorneys to assist its customers in the timeshare exit process.

Wesley advertises that it can assist customers in cancelling their timeshares "legally," and it leads customers to believe that the cancellation involves something other than payment default or applying for Westgate's voluntary relinquishment program. (*See, e.g.*, Grauberger Dep. 34–35, Doc. No. 265-3, at 11–12.) Chuck McDowell, in fact, repeatedly insisted during his deposition that the process primarily involves Wesley's writing letters on behalf of the client. (*See, e.g.*, McDowell Dep. 47, 72, 178, 209.) Westgate's position is that the only thing a Westgate owner can do to induce cancellation of her timeshare contract is to default on payments due under her contract,

---

[3] To protect the privacy interest of Westgate owners/Wesley customers who were deposed in this action but are not parties to this litigation, the court refers to these individuals throughout by their initials only.

[4] Wesley objected to many of the plaintiff's "statements" on the grounds that they are "not supported by admissible evidence" as required by Federal Rule of Civil Procedure 56(c)(2). (*See, e.g.*, Def.'s Resp. SUF ¶¶ 2, 4, 8, 9, 11, 14, etc.) These objections appear to be based on vague "objections" interposed by defense counsel during depositions. Rule 56(c)(2), however, simply permits a party to "object that the material cited to support or dispute a fact *cannot* be presented in a form that would be admissible in evidence" (emphasis added), not that it *has not* been presented in a form that would be admissible in evidence. For purposes of the plaintiff's Motion for Partial Summary Judgment, the court has largely disregarded these unsubstantiated objections.

which eventually leads to foreclosure or a deed in lieu of foreclosure, and that Wesley knows this, induces owners to stop payments, and then, when Westgate terminates the timeshare contract through foreclosure or a deed in lieu of foreclosure, claims that Wesley's efforts successfully led to cancellation.

Wesley spends approximately $400,000 per week on its marketing efforts. Most of its advertising is web-based.

## B. Wesley's Sales Calls

When a potential customer makes contact with Wesley, the person will have an initial telephone call with a Qualifications Specialist ("QS"), who confirms whether Wesley accepts customers seeking release from obligations to the particular timeshare company and generally sets the stage for the so-called qualifications process. Next, the customer will have a second call with a QS, during which the QS asks questions purportedly to elicit whether the customer was lied to in connection with the timeshare purchase. Finally, the customer will have a third telephone call with a Wesley Vice President ("VP"), which is what Wesley calls its salespeople. The VP is the "final decision-maker in whether a potential client is qualified to become a paying client." (Browning Dep. 83–84, Doc. No. 265-8, at 28–29.)

McDowell repeatedly testified during his deposition that Wesley's policy is to only accept as customers those people who were lied to by the timeshare company in the course of the timeshare company's sales process. (*See, e.g.*, McDowell Dep. 72, 108, 142, 155.) Westgate asserts that McDowell and Wesley are aware that whether a customer claims to have been lied to has nothing to do with whether the timeshare will be cancelled. McDowell acknowledged that Wesley's letter-writing campaign has in the past had no effect on Westgate's decision whether to cancel a timeshare, but he repeatedly stated that he continued to hope that Westgate would "start doing the right thing" some day. (*See*, *e.g.*, *id.* at 175, 176; *see also id.* at 151 (acknowledging that, in his experience, if a customer continues to pay, Westgate will never cancel the timeshare); *see*

*also* Jacobs Dep. 120, Doc. No. 289-9, at 5 (noting that, "in our experience, we have never had them [Westgate] say 'Yeah, this sounds great, we'll let you out,'" in response to a letter).) Wesley maintains that the purpose of its letter-writing efforts and other communications is to "increase visibility into the timeshare's tactics and put pressure on the timeshare to resolve the situation" and that the "communications are sent until the timeshare developer eventually does the right thing and releases the timeshare owner from their timeshare contract." (Def.'s Resp. SUF ¶ 8.) It cites the testimony of Taylor Jacobs, who insisted that the letter-writing campaigns would eventually lead to cancellation of the timeshare, while also acknowledging that cancellation would only happen once the customer was in payment default. (Jacobs Dep. 143, Doc. No. 289-9, at 7.) Westgate asserts, in short, that letters and other communications from Wesley (or Westgate owners who have hired Wesley) have no effect on whether Westgate will cancel a timeshare, while Wesley insists that its letter-writing campaign (apparently in conjunction with the customer's payment default) eventually leads to cancellation. The court finds that the record clearly establishes, based on Wesley's representatives' testimony and that of the Wesley customers that is in the record, that no Westgate owner's timeshare has been cancelled as a result of anything other than the customer's payment default and that Wesley obviously knows this.

Westgate asserts that Wesley's representatives engage in the unauthorized practice of law vis-à-vis Westgate timeshare owners (and others) who contact Wesley. In particular, Westgate points to references to the law employed by Wesley agents during sales calls, citing, for example, a recorded call by Dan Halliman:

> One, legally, we cannot tell you to stop your payments, so we're not. Number two, we're advising you to stop your payments because of the following, and this is a legal issue. If you continued to make payments, you're stating that you are in agreement with the terms of the contract you signed. And if you're in agreement, there's nothing that can be done. But we will be advising you to stop your payments and you'll simply no longer make payment. Again, we're not telling you to stop your payments; we just can't take your case unless you're willing to do that because nothing will happen if you don't [stop payments].

(Browning Rule 30(b)(6) Dep. 191, Doc. No. 265-6, at 99 (quoting recording of Halliman telephone call with client).)

As another example, Westgate cites a call made by Jon Browning, then a VP but currently Wesley's Chief Operating Officer (*id.* at12, Doc. No. 265-6, at 4), in which he explained to a Westgate owner that his timeshare property is "being held by an unsecured debt, which is a timeshare. And . . . credit bureaus and other lenders and creditors [are] not fond of a timeshare debt. It's an unsecured debt." (*Id.* at 291, Doc. No. 265-8, at 65.) Later in the same conversation, the customer asked Browning if there was a possibility that Westgate could sue them. Browning responded that, although he could not make promises, Westgate had never sued anyone else in the history of Wesley's services. (*Id.* at 298–99, Doc. No. 265-8, at 72–73.)

It is undisputed for purposes of Westgate's motion that Wesley is not a law firm and that its VPs and QSs are not lawyers, are not advised by lawyers, and do not actually review any of the timeshare documents to determine whether the timeshare owner received full disclosure of the relevant facts at the time of purchase. In addition, Wesley's Enrollment Agreements with its customers expressly contain language notifying the customer that it is not a law firm. (*See, e.g.*, Doc. No. 289-4, at 7 ("WFG is not a law firm and does not offer legal or tax advice. You agree that you have not sought legal or tax advice from WFG and that WFG has not offered You any legal or tax advice.").)

Nonetheless, as Westgate points out, many of Wesley's sales calls, like those referenced above, are "littered" with discussion of what various provisions in the timeshare contracts mean and what the Westgate owners' legal rights are. (*See, e.g.*, Halliman Dep., Doc. No. 265-4, at 84 ("Part of my responsibility, Joanne, as the senior vice president[,] is to make sure if we take a case that we can actually guarantee a cancellation."); *id.* at 85 ("[A]s a company, we have to make absolutely sure that . . . the cancellation qualifies for a legal cancellation[.]"); *id.* at 75 (purporting to explain what a cancellation means "from the legal perspective"); *id.* at 92 (explaining to a

timeshare owner, "When you sign the contracts in today's day and age, because of the way the contracts are now structured, the legality of this going to your children cannot happen unless you do a couple of things. . . . [T]he only way your children can actually inherit this timeshare is if prior to your death, you put it in a will or you draw up a trust and you assign your children to it."); *id.* at 96 ("Legally, that ownership is for years and years. Most times, it's written on a 99-year time frame. And the reason they do that is because it is the longest allowable time by law here in the United States that you can actually write a timeshare ownership for.").)

As indicated above, according to McDowell, Wesley only takes as customers individuals who were lied to by their timeshare company. His position is that Wesley is in the business of obtaining cancellation of its customers' timeshare contracts and that Wesley achieves that objective by writing letters and making complaints to the timeshare company and various third parties. (McDowell Dep. 72, 178, 208–09; *see also* Irwin Dep., Doc. No. 265-5, at 42 ("Q. So the service is going to be based on the customer being lied to or misled, right? A. Correct. Q. And in terms of what Wesley does with that information, that's prepare the letters or the complaints that we talked about, right? A. Yep.").) Wesley's process involves telling potential customers that Wesley is able to cancel the timeshare *because* the owner was lied to. (Browning Dep. 147, Doc. No. 265-8, at 43; Browning Rule 30(b)(6) Dep. 194, Doc. No. 265-6, at 102 (quoting Halliman telephone call with customer).) Jon Browning admitted during his Rule 30(b)(6) deposition, however, that it is not true that Wesley effects cancellation of a timeshare debt "because it's fraudulent debt." (Browning Rule 30(b)(6) Dep. 194, Doc. No. 265-6, at 102.) Wesley also falsely tells owners that Westgate has no "legal recourse" if a customer stops making mortgage payments. (*See, e.g.*, Halliman Dep., Doc. No. 265-4, at 80.)

### C.    Wesley's Fee

According to McDowell, Wesley's fee can range from a minimum of a few thousand to a maximum of $30,000, set entirely at the discretion of the VP (purportedly subject to some sort of

guideline).[5] (McDowell Dep. 317–19.) The average, as of January 2020, was $8,253, which was a significant decrease from the average in previous years, because this is when Wesley first implemented a cap on the fees.

### D. The Terminations

It is apparently undisputed that Wesley's electronic records reflect that, of approximately 3,130 Wesley customers who are identified as Westgate owners, 2,138 are noted to have a mortgage, 703 have no debt, and 289 are not specified as to whether they have a mortgage with Westgate. The disposition of the Wesley customers' Westgate timeshares, based on category, has been summarized in a chart by Westgate, the accuracy of which Wesley does not contest, as follows:

---

[5] It appears that, in many cases, the VP endeavors to structure a customer's payments to Wesley so that they are basically equivalent to the amount the customer was paying to Westgate until being advised to stop those payments. (*See, e.g.*, P.B. Dep. 41, Doc. No. 265-41, at 13 (deposition testimony by Westgate owner that her payments to Wesley were "painless" as they were "close to the same amount as what [she was] paying Westgate" and that, as Wesley presented it to her, she was simply "going to be paying Wesley, instead of Westgate").)

| STATUS OF WESLEY CUSTOMERS | | | |
|---|---|---|---|
| | **WITH DEBT** | **WITHOUT DEBT** | **UNSPECIFIED IF DEBT** |
| Stalled or Suspended | 4 | - | - |
| Wesley Contract Terminated | 151 | 47 | 79 |
| Timeshare Cancelled or Closed | 710 | 166 | 141 |
| In Process | 1,273 | 490 | 69 |
| **TOTAL** | **2,138** | **703** | **289** |

Of the customers whose timeshares have been cancelled, Wesley's records reflect the following types of cancellation or closure:

| TYPE OF CANCELLATION OR CLOSURE | | | |
|---|---|---|---|
| | **WITH DEBT** | **WITHOUT DEBT** | **UNSPECIFIED IF DEBT** |
| Charge Off[6] | 6 | - | 2 |
| Deed in Lieu of Foreclosure | 277 | 16 | 32 |
| Foreclosure/Non-Pay or Trustee's Sale | 414 | 2 | 58 |
| Mutual Release[7] | 7 | 7 | 2 |
| Legacy / Deedback or Quit Claim Deed | 6 | 141 | 43 |
| Unspecified / No Data | - | - | 4 |
| **TOTAL** | **710** | **166** | **141** |

Regarding whether Wesley customers who are Westgate owners stop making mortgage (or other) payments, Wesley's records reflect the following:

---

[6] Westgate states that "2 of these 6 records have a client name that includes an unrelated timeshare developer—*i.e.*, Wyndham or Diamond—and do not appear to be Westgate customers. Moreover, neither Westgate nor Wesley describe[s] any Westgate cancellation as a 'Charge Off.' These are likely errors in Wesley's data." (Doc. No. 289-1, at 10 n.2.)

[7] Westgate states that some of these records, too, are associated with a non-Westgate timeshare developer, 4 are still "open accounts in Westgate's records, 2 were cancellations during rescission, 2 were purchaser default, 2 were deeds in lieu of foreclosure, 1 was Westgate Legacy Program, and 1 foreclosure," and none of these actually involved a "'mutual release' document or any arrangement consistent with the common understanding of a mutual release." (Doc. No. 289-1, at 10 n.3.)

| STATUS OF PAYMENTS TO WESTGATE FOR WESLEY CUSTOMERS | | | |
|---|---|---|---|
| | **WITH DEBT** | **WITHOUT DEBT** | **UNSPECIFIED IF DEBT** |
| "ZD Stopping Payment" | 6 | 23 | - |
| "Client has large purchase soon" | 25 | - | - |
| "Client chose to continue payment" | 31 | 28 | 4 |
| "Waiting on RS[8] to advise when to stop" | 124 | 26 | 3 |
| "Client chose to stop payments now" | 1,186 | 36 | 15 |
| Unspecified / No Data | 766 | 590 | 267 |
| **TOTAL** | **2,138** | **703** | **289** |

### E.      Alleged Secrecy and Deception

Wesley customers are instructed not to reveal to Westgate that they are working with Wesley, and Wesley employs several practices to conceal its involvement, including by using caller ID spoofing technology so that it can make phone calls on behalf of its customers that look like they are coming from the customer, impressing upon customers their obligation not to reveal Wesley's involvement, and going so far as to encourage customers to lie if asked whether they are involved with a timeshare exit company.

Wesley's contracts with Westgate owners state that, if the customer breaches "confidentiality," Wesley has the right to terminate the contract without refunding any of the customer's fee, and customers are also reminded verbally that they have to keep Wesley's involvement a secret. (*See, e.g.*, G.T. Dep. 84, Doc. No. 265-43, at 19; S.O. Dep. 81–82, Doc. No. 265-44, at 27–28.)

Taylor Jacobs, Wesley's Vice President of Exit Solutions, testified that Wesley sometimes amends its contract to remove the money-back guarantee if a customer discloses to Westgate that he or she working with Wesley (Jacobs Dep. 9, 170, Doc. No. 265-13, at 5, 34.) Jacobs also acknowledged that Wesley uses a system called "Caller ID Faker" to "mimic the client's phone

---

[8] A Wesley employee designated as a "resolutions specialist."

number if we are making a call to the timeshare" on behalf of the client. (*Id.* at 129, Doc. No. 265-13, at 25.) The use of this system insures that the recipient's (the timeshare company's) caller ID will reflect the customer's telephone number rather than Wesley's. (*Id.* at 130, Doc. No. 25-13, at 26.) Wesley, in fact, uses the system so that Westgate will speak to the Wesley employee under the belief that it is actually a Westgate customer. (*Id.*) Typically, the purpose of such a call is to "get the update of their case," to "try and further their case in order to get termination," or to make a phone call to the timeshare company that "the client is not comfortable making." (*Id.* at 131, Doc. No. 25-13, at 27.) The "ultimate goal" is "cancellation of a contract for Wesley's customer." (*Id.*) Lauren Gray, Wesley's Vice President of Customer Operations, also testified that Wesley conceals its involvement by "call[ing] the timeshare company and pretend[ing] to be the customer," with the customer's permission. (Gray Dep. 11, 218–19, Doc. No. 265-12, at 6, 42–43.)

On at least one occasion, Wesley has drafted a letter for a customer in which the customer adamantly, elaborately, and falsely denies that it had hired Wesley. (*See* Jacobs Dep. 209–10, Doc. No. 265-13, at 36–37.) McDowell, while stating that it is never "okay to lie," was nonetheless "damn sure" that it is okay for a *client* to lie to Westgate if that is what is required to "get out" of their contract with Westgate. (McDowell Dep. 195–96.)

At some point while this litigation was pending, Westgate began requiring owners receiving a voluntary cancellation to sign an affidavit denying that they are working with Wesley or any other timeshare exit company. Wesley is aware of this fact. (*See, e.g.*, Irwin Dep., Doc. No. 265-5, at 14–15; Gray Dep. 255–56, Doc. No. 265-12, at 63–64.) According to Gray, Wesley's policy regarding the affidavit is that the customer "has to make that decision, whether to sign or not." (Gray Dep. 257, Doc. No. 265-12, at 65.) At least some Wesley employees, however, actively encourage Westgate owners to sign such affidavits and assure them that it is "okay for [them] to sign." (*See, e.g.*, *id.* at 257–58; *see also id.* at 263–64 (referencing a communication to a customer

advising him that Wesley cannot "legally tell [him] whether to sign or not to sign the affidavit" but also assuring him that the affidavit requirement is a "scare tactic" employed by Westgate); *id.* at 270–71 (referencing a customer call in which the affidavit requirement was again characterized as a "scare tactic" and the client was advised that she had to "sign this paperwork in its entirety to be released from [her] timeshare" and that Wesley had not "had any issues with anyone else who has signed a the third-party waiver"). It is undisputed that many of the Wesley customers/Westgate owners whose deposition testimony is in the record were advised to sign the affidavit falsely affirming that they had not worked with a timeshare exit company and that the customers did, in fact, sign the affidavits. It is also undisputed that some Westgate owners have now been sued for allegedly signing false affidavits.

Wesley, in an attempt to establish a material factual dispute, points to customer testimony to the effect that the customers knew that it was their own decision whether to sign the affidavit and that Wesley told them that it was their own decision. (*See, e.g.*, W.O. Dep. 80, Doc. No. 289-19, at 7 ("I was not coerced by Wesley to sign this document. They did not try to encourage me to do so. I listened to my own personal decision."); K.D. Dep. 77, 87, Doc. No. 289-3, at 5, 6 ("In order to get out, I had to sign this affidavit and I wanted out. . . . [I]t's none of their business if I had contact with a third party as far as I'm concerned."); R.B. Dep. 138, Doc. No. 289-16, at 10 ("[A]ll the experiences I had with Westgate led me to believe that I needed help and they didn't need to know that I had someone helping me."); *id.* at 139 ("They didn't – they told me it was my decision. I made the conscious decision to [sign the affidavit].").)

### F. Westgate Owner Testimony

Summarized here are a few of the customer deposition excerpts provided by the parties.[9]

---

[9] Westgate filed excerpts from 24 Westgate owners. The court has examined all of the excerpts as well as Wesley's 29 counter-designations. The customers' testimony regarding Wesley's practices is relatively consistent, despite minor variations related to the individuals' circumstances. For instance, some customers apparently placed more reliance on Wesley's

*A.P. (Foreclosure)*

Westgate owner A.P. testified that she decided at some point in late 2018 that she no longer wanted to own her Westgate timeshare, but she kept paying her mortgage. (A.P. Dep. 42, Doc. No. 265-25, at 7.) She eventually began looking for information about how to get rid of her timeshare and came across reviews for different timeshare exit companies. An ad for Wesley stood out because it mentioned Westgate timeshares specifically. A.P. testified that she had called Westgate two or three times to try to discuss cancelling her timeshare, to no avail, and therefore decided that she needed to hire an outside company. (*Id.* at 45, Doc. No. 265-25, at 8.) It was also important to her that Wesley stated that her credit would not be negatively affected and that they would assist her in repairing it if it was affected. (*Id.* at 48, Doc. No. 265-25, at 10.) She formed the impression, even before contacting Wesley, that the cancellation "would be done in a legal way. (*Id.* at 49, Doc. No. 265-25, at 11.) She ultimately hired Wesley in December 2018 for almost $7,000, more than she had paid by then toward purchasing her timeshare.

A.P. testified that the Wesley representative she worked with advised her to stop making her mortgage payment because, as she understood it, "they were in a legal process to cancel [her] timeshare." (*Id.* at 56–57, Doc. No. 265-25, at 12–13.) Wesley also told her that there "may be an initial impact to [her] credit" but "it would then be resolved afterwards." (*Id.* at 57, Doc. No. 265-25, at 13.) She also stated that she recalled that foreclosure was mentioned as a possibility, but she did not think she would have hired Wesley if the Wesley representatives had said to her up front, "the way that we're going to get your timeshare canceled is by going through foreclosure." (*Id.*)

representations than others. (*See, e.g.*, C.J. Dep. Doc. No. 286-5, at 8–9 (asked whether he believed the Wesley representative's statement that "Wesley helped people who had been lied to or misled in the timeshare sales process, responding, "Like I said, I don't trust. I don't fully trust nothing that has to do with money from people today. I took a chance. I took a chance. So, I did believe it, yeah, in part.")); A.M. Dep., Doc. No. 286-6, at 7 ("Q. Did you believe the Wesley representative when he told you that stopping payments to Westgate would not constitute a legal default on your payment obligation? A. Yes.").)

She also testified that she did not think she would have needed Wesley's help to simply stop making mortgage payments and to go through the foreclosure process. (*Id.* at 58, Doc. No. 265-25, at 14.) She confirmed that she stopped making mortgage payments because Wesley told her to. (*Id.* at 74–75, 82, Doc. No. 265-25, at 18–19, 22.) It is apparently undisputed that A.P.'s timeshare was cancelled through an non-judicial foreclosure, and A.P. testified that she was ultimately satisfied that Wesley "d[id] its job" of getting her out of her timeshare. (A.P. Dep. 180, Doc. No. 289-7, at 7.)

### G.A. (Deed in Lieu of Foreclosure)

G.A. ultimately obtained a deed in lieu of foreclosure after hiring Wesley in February 2018 for a fee of $7,250. He hired Wesley because he was "the little guy going against the big company," and he thought that "lawyers" would be handling the matter. (G.A. Dep. 31, Doc. No. 265-22, at 6.) He testified that he did not know that Wesley was not a law firm, even though he also signed a document purporting to acknowledge that Wesley would not engage in the "unauthorized practice of law" and a contract stating that Wesley was not a law firm. (*Id.* at 55; *see also id.* at 109, Doc. No. 289-30, at 3.) G.A. testified that Wesley led him to believe that, because he had been lied to, Wesley could help him. He paid Wesley $7,250. It was important to him that Wesley promised credit repair. Wesley instructed him to cancel his automatic payments to Westgate, and he testified that he "probably" did so in response to that instruction. (G.A. Dep. 63, Doc. No. 265-22, at 13.) Once he stopped, he never resumed making payments. Ten months into the process, he began to think that "Wesley was just engaged in busy work while [he was] continuing to receive delinquent notices and collection notices and getting closer and closer to foreclosure." (*Id.* at 94, Doc. No. 265-22, at 22.)

In February 2019, Westgate offered him a deed in lieu of foreclosure. G.A. forwarded the documents to Wesley to obtain "instructions or advice" about this legal document. (*Id.* at 99–100, Doc. No. 265-22, at 27–28.) Wesley's response was that this was the "type of offer that we have

been working the last several months to achieve" and advised him to sign. (*Id.* at 100–01, Doc. No. 265-22, at 28–29.) G.A. agreed, at the close of his deposition, that it "sure doesn't seem like" Wesley had done much to achieve the cancellation of his timeshare. (*Id.* at 105, Doc. No. 265-22, at 30.)

### S.R. (Non-judicial Foreclosure)

S.R. purchased a Westgate timeshare in 2006 and then upgraded her purchase in 2014 "willingly," by mail, so no Westgate employee made any representations to her about the later timeshare purchase. (S.R. Dep. 19, 26, Doc. No. 265-23, at 7, 11.) She hired Wesley in March 2018, after seeing Wesley advertisements, for help getting out of the timeshare, and she ultimately paid Wesley $6,575. Her understanding was that Wesley was in the business of "[h]elping people legally get out of their timeshares." (*Id.* at 35–36, Doc. No. 265-23, at 12–13; *id.* at 51, Doc. No. 265-23, at 18 ("We were under the impression that the way we would be doing it is that . . . it would be through the legal, you know, exit of the timeshare" and that her "credit probably wasn't going to be ruined for life").) She also believed that Wesley was "affiliated with a law firm." (*Id.*)

She was under the impression that, once she and her husband hired Wesley, or "once we had started the procedure, that we would be able to stop making payments at that point, and we did." (*Id.* at 39, Doc. No. 265-23, at 16.) In fact, she and her husband were told early on that they "could stop making payments" and that the amount they owed would "go away, once the timeshare was cancelled." (*Id.* at 53, Doc. No. 265-23, at 20.) They stopped making payments because Wesley told them they could. (*Id.* at 60, Doc. No. 265-23, at 27.) S.R. also understood that whether to stop payments was "up to [her] and [her] husband." (*Id.* at 149, Doc. No. 289-36, at 3.) She was told that stopping payments could "potentially impact" their credit, but she was given "letters for the credit agencies to explain that we were in the process of trying to get out of the timeshare so that it wouldn't negatively impact our credit long term." (*Id.* at 54, Doc. No. 265-23, at 21.) Wesley gave them the impression that it would offer credit amelioration. (*Id.*) S.R. testified that she and

her husband specifically preferred to cancel the timeshare "in a legal . . . on-the-table kind of way," rather than simply through payment default. (*Id.* at 58, Doc. No. 265-23, at 25.) She believed that Wesley was offering "something other than foreclosure." (*Id.* at 72, Doc. No. 265-23, at 29.)

Wesley drafted letters and emails for her to send to Westgate purporting to invoke various legal rights. Eventually S.R. began to sense that Wesley's letters were not accomplishing anything, but she had already paid Wesley; it purported to have a 100 percent success rate, and she did not want to lose what she had already spent. (*Id.* at 124, Doc. No. 265-23, at 34.) She also authorized Wesley to use caller ID spoofing to call Wesley and pretend to be her. (*Id.* at 124–25, Doc. No. 265-23, at 35–36.)

When she received a foreclosure notice from a law firm representing Westgate, she forwarded it to Wesley, expecting Wesley to advise her on how to proceed. (*Id.* at 128–29, Doc. No. 265-23, at 38–39.) Up until that point, she had not realized that Wesley was not a law firm. Ultimately, S.R.'s timeshare was terminated by Westgate through a nonjudicial foreclosure process, but Wesley did not explain to S.R. what was going on other than to tell her it was "good news" and to offer her "credit services free of charge." (*Id.* at 133, Doc. No. 265-23, at 43.) S.R. stated that she was ultimately satisfied with Wesley's performance on her behalf, as she did, in fact, achieve the objective of cancelling her timeshare. (*Id.* at 195, Doc. No. 289-36, at 11.)

### *G.T. (Deed in Lieu of Foreclosure)*

G.T. signed up with Wesley in October 2019. She assumed Wesley's process would be a "legal" one, though she acknowledged that she was told at some point that Wesley's representatives were not lawyers. (G.T. Dep. 62, Doc. No. 265-43, at 6.) She assumed that they were supervised by a lawyer. (*Id.* at 64, Doc. No. 265-43, at 8.) Wesley does not dispute that it led her to believe that sending ghostwritten complaints to Westgate on her behalf was going to result in her timeshare cancellation. G.T., like many other testifying customers, was told by Wesley that "[b]uilding [her] unique case takes time to ensure an accurate strategy is created for the best

possible outcome." (*Id.* at 86, Doc. No. 265-43, at 21.) She was also told, like all other customers, to keep Wesley's involvement confidential. (*Id.* at 83, Doc. No. 265-43, at 18.) She knew that keeping Wesley's involvement a secret was important to Wesley and that her contract with Wesley provided that she would forfeit fees paid to Wesley if she disclosed Wesley's involvement. G.T. paid Wesley's fee of approximately $6,000 in a lump sum because it was less expensive than paying it over time. (*Id.* at 78, Doc. No. 265-43, at 14.)

After she stopped making mortgage payments, G.T. received delinquency notices from Westgate and experienced negative credit reporting. Wesley advised her to continue not to pay Westgate and that, although her credit would drop initially, "[i]t would be taken care of" after the process was finalized. (*Id.* at 76, Doc. No. 265-43, at 12.) Wesley did not give her more specific information than that about credit repair, except that the cost was included in her fee. (*Id.*)

G.T. testified that she was aware that she did not have to pay Wesley a fee to get out of her timeshare through foreclosure, but she also stated that she was "paying for advice," and the advice was to stop paying her timeshare mortgage. (*Id.* at 81, Doc. No. 265-43, at 16.) She would not necessarily have paid Wesley $6,000 if she had known that she was going to end up with a cancellation through default, but she would not have stopped paying her mortgage if she had not been advised to do so by Wesley. (*Id.* at 81–83, Doc. No. 265-43, at 16–18.) She also ended up paying Westgate over $1,700 (essentially covering the missed payments) for it to accept a deed in lieu of foreclosure. (*Id.* at 123, Doc. No. 265-43, at 33.) Asked whether she was satisfied with paying Wesley $6,000, paying Westgate the additional $1,700, experiencing negative credit reporting, and then signing a deed in lieu of foreclosure, G.T. responded: "Yes, yes. . . . I was out of an obligation of paying money for the next lifetime." (*Id.* at 124, Doc. No. 265-43, at 34.)

To finalize the termination of her timeshare, she followed Wesley's advice and signed the affidavit swearing she had not worked with a lawyer or timeshare exit company, knowing that she was lying under oath and despite being very uncomfortable about doing so. (*Id.* at 130–31, 134,

Doc. No. 265-43, at 38–39, 43.)

After learning that the affidavit was false, Westgate filed a lawsuit against G.T. to have the deed in lieu of foreclosure transaction set aside, to reinstate the note, and to collect on the note.

### S.O. (Deed in Lieu of Foreclosure)

S.O. hired Wesley in November 2019 for $5,500. Wesley led her to believe that it could cancel her timeshare based on her having a legitimate complaint about Westgate and that Westgate would do it all legally. Wesley led her to believe that it would be communicating with Westgate on her behalf, sort of like a lawyer acting as her representative. She stated that the most important factor in her decision to hire Wesley was the success rate Wesley claimed to have. (S.O. Dep. 44–45, Doc. No. 265-44, at 7–8.)

The Wesley VP assigned to her case told S.O. that she could and should stop making payments to Westgate and that Wesley would provide additional advice down the road about how to disable the automatic payments. She was also told that Wesley had an in-house credit department that would take care of any negative credit reporting. Wesley presented its fee as $9,750, but with a purported military discount, it would be $7,510 (if paid in installments) or $5,507 (if paid in full). Wesley offered to work with her on structuring installment payments so that the payments would be close to what she had been paying Westgate. (*Id.* at 67, Doc. No. 265-44, at 16.)

After she hired Wesley, another Wesley representative confirmed that she should stop making payments to Westgate, and she followed that advice. A third Wesley employee assured her that stopping payments would make the "timeshare termination process go[] faster and would be a "strategic move" and that she should keep Wesley's involvement a secret. (*Id.* at 81–82, Doc. No. 265-44, at 27–28.) She was also told that "[b]uilding [her] unique strategy" would take time, because Wesley would "review all of [her[ documents and "formulate a plan that best suits [her] case." (*Id.* at 23, 26, Doc. No. 265-44, at 77, 80.)

Ultimately, Wesley made calls to Westgate, pretending to be S.O., and, once S.O.'s account

was sufficiently delinquent, Wesley reported to her that Westgate was willing to offer a deed in lieu of foreclosure. S.O. relied on Wesley to advise her as to whether the proposed deed in lieu of foreclosure was a good deal. Wesley explained how the process would work and assured her it was a "good deal" and not the type of offer Westgate made "every day," even though Westgate also required her to pay a fee of $1,800. (*Id.* at 113–15, Doc. No. 265-44, at 31–33.) Wesley then called Westgate, pretending to be S.O., and paid the fee using S.O.'s credit card.

S.O. then received the paperwork from Westgate, including the affidavit. She sent the documents to Wesley to look them over, because some of the wording seemed "odd." (*Id.* at 129–30, Doc. No. 265–44, at 38–39.) S.O. ultimately signed the affidavit falsely attesting that she had not worked with a timeshare exit company, and she stated that she did "not think" she would have signed the affidavit if Wesley had not advised her to do so. (*Id.* at 139, Doc. No. 265-44, at 45.)

Wesley did not tell her in advance that Westgate might present her with an affidavit requiring her to swear under oath that she had not worked with a timeshare exit company in order for it to accept a deed in lieu of foreclosure, nor did Wesley explain how its fee was determined. (*Id.* at 71, Doc. No. 265-44, at 20.) She stated, in hindsight, that she did not understand why Wesley would knowingly "tell [her] to go ahead and sign this if they knew they were false statements." (*Id.* at 131, Doc. No. 265-44, at 40.)

After learning that the affidavit was false, Westgate filed suit against S.O. to have the deed in lieu of foreclosure set aside, to reinstate the note, and to collect on the note.

### *A.S. (No Cancellation)*

A.S. hired Wesley in August 2019. He initially contacted Wesley based on advertisements indicating it could help get him out of his timeshare legally, that it had a "unique ability to cancel the timeshare," and had a "100% money-back guarantee." (A.S. Dep., Doc. No. 265-29, at 5.)

After he contacted Wesley, Wesley asked him a series of questions and led him to believe that his answers to the questions would show whether he qualified for Wesley's services and would

allow Wesley to built a case for him. (*Id.* at 6–7.) Wesley made representations to him about what the total cost of his timeshare would be if he continued to own it, that the maintenance fees could increase by 8% per year, and that, when he died, his kids would have to pay the maintenance fees. Wesley told him his consumer rights had been violated and it would "fight for [his] consumer rights." (*Id.* at 11.)

The Wesley representative he spoke with next advised him that, normally, he would advise a client to stop paying Westgate as soon as he had signed his contract with Wesley, but in A.S.'s case, he was advised to wait until he had closed on the purchase of a new home. After that, however, the representative said, "we're shutting them down," referring to his payments to Westgate. (*Id.* at 11–12.) The representative told him that, once he stopped maying payments to Westgate, it could negatively impact his credit, but Wesley had an "in-house credit department" and would do "credit maintenance to have negative or derogatory marks taken off his credit." (*Id.* at 13.) A.S. believed these representations, including the claim that Wesley originally offered this service only to military clients, but it was "so successful" that it now offered it to everyone. (*Id.*)

A.S. was told that his case would be referred to a resolution specialist who would work closely with him to write every letter and prepare every document on his behalf, but that he would have to send the letters. They would then review Westgate's responses together to decide what the next steps would be. A.S. was assured that Wesley would slowly "build a case" for him, to prove Westgate's fraudulent conduct, and then eventually request termination and a refund. (*Id.* at 23.) A.S. believed that Wesley's program would be customized for him and that the letter-writing campaign would have some effect on the cancellation process. (*Id.*)

A.S. was told that his fee would be $9,680 if paid in full or in three equal installments, or $10,680 if paid over time. (*Id.* at 17.) He was told that he could just pay Wesley instead of Westgate. (*Id.*) He was told that his contract was for 36 months and that, at the end of that time, if his timeshare had not been cancelled, he could decide whether to extend the term or get a refund,

but that "Wesley has never had one go for 36 months with Westgate." (*Id.* at 19.) After all these calls, A.S. signed a written agreement with Wesley, stopped making payments to Westgate, and began making payments to Wesley instead. (*Id.* at 20.) He stopped making payments to Westgate because Wesley told him he could. (*Id.*)

A.S. began receiving delinquency notices from Westgate, but Wesley told him not to worry, to keep doing what he was doing, and that Westgate was just trying to "scare [him] into paying." (*Id.* at 21–22.) Wesley also began drafting letters and complaints to send to Westgate and third parties and told A.S. they would prove "Westgate's fraudulence." (*Id.* at 23.) Westgate's responses generally indicated that it believed A.S.'s contract was valid and binding and that he did not have a valid complaint. (*Id.* at 27–28.)

In response to a collection notice, Wesley sent A.S. a letter referencing the Fair Debt Collections Practices Act and "invoking various laws and legal principles," which A.S. signed and mailed to the collection agency. (*Id.* at 24.)

In May 2020, A.S. forwarded to Wesley a letter he had received from Westgate, indicating that, due to his delinquency, his account had been assigned to the "Pre-Charge Off unit" and was being reviewed for deed recovery and foreclosure. (*Id.* at 25.) The letter also notified him that his loan had been accelerated, so that the full balance was due and that foreclosure was the next step. A.S. understood that this step resulted from his having stopped making payments to Westgate. (*Id.* at 28–29.)

Wesley's response to Westgate's notice was that this was "GREAT NEWS," and A.S. believed it because of hearing it from Wesley. (*Id.* at 29.) Wesley asked him to complete a review for Wesley and his resolutions specialist, which A.S. did not do. Wesley also told him that having his account sent to the Pre-Charge Off unit meant that Westgate would be terminating his timeshare. (*Id.* at 30–31.) A.S. agreed that, if he had known up front, he would not have paid Wesley $10,000 just to have his timeshare mortgage foreclosed on. (*Id.* at 31.)

As of December 2020, A.S.'s timeshare still had not been cancelled. As of the date of A.S.'s deposition (January 2022), the status of his timeshare account had not changed. His credit score had dropped 120 points, and he had experienced a negative impact as a result of this drop. (*Id.* at 33.)[10]

A.S. also stated that, when he hired Wesley, he believed it was a law firm or that it would have lawyers working on his behalf. (*Id.*) He believed that Wesley would provide a "legal" cancellation that involved something other than payment default. (*Id.* at 34.) He relied on Wesley's advice throughout the process. (*Id.* at 34–35.) Wesley points out that its contract with A.S. states that Wesley is not a law firm, and A.S. testified that he now understands that Wesley is not a law firm. (Stinson Dep. 56–57, Doc. No. 289-43, at 4–5.)

### G.    Credit Repair Services

As indicated above, Wesley sales representatives, at least until recently, promised credit repair services when advising customers to stop making payments to Westgate, and they pitched credit repair as an important part of Wesley's service, all included with the fee. Until May of 2020, Wesley referred customers to a third party, Credit Guru, for credit services. Beginning in May 2020, Wesley began referring customers to a newly created affiliate, Wesley Credit Repair, LLC. Wesley paid for the credit services from the fees it collected. According to Wesley, it removed reference to credit services from its customer contracts beginning in October 2021. (Gray Dep. 41, Doc. No. 289-10, at 3.) There is no dispute that Wesley itself never engaged in credit repair services. Rather, Westgate contends that Wesley offered credit repair services that it knew it could

---

[10] It seems that Wesley's purported objective—to "increase visibility into the timeshare's tactics and put pressure on the timeshare to resolve the situation" (*see* Def.'s Resp. SUF ¶ 8)—has backfired, as Westgate is apparently now less willing than it was only a couple of years ago to release people from timeshare contracts through a deed in lieu of foreclosure and more willing both to pursue foreclosure and to sue individuals who sign affidavits falsely attesting that they did not work with a timeshare exit company in order to obtain a deed in lieu of foreclosure. It is seemingly also more likely to report payment defaults to the credit reporting agencies.

not provide and made promises to customers and potential customers regarding credit repair that it knew would not be fulfilled, either by it or by a third party.

Katie Neher, President of Wesley Credit Repair, LLC, testified as a Rule 30(b)(6) witness for Wesley Financial Group. (*See* Neher Dep. 13, Doc. No. 265-11, at 9.) She described the service provided by a credit repair company as "[w]orking anything inaccurate, erroneous, false, [or] obsolete on their credit that a client indicates is inaccurate." (*Id.* at 75, Doc. No. 265-11, at 25.) She also acknowledged that it is illegal for a credit repair organization to guarantee that any negative information on a person's credit report will be removed. (*Id.* at 89, Doc. No. 265-11, at 38.) She agreed that "it's ultimately up to the timeshare to remove the demerits" from a person's credit report and that, if a timeshare company chooses not to remove an accurate demerit, it stays there. (*Id.* at 91–92, Doc. No. 265-11, at 40–41 ("But yeah, if it – legally if there's nothing wrong with it, it can stay on your credit for up to seven years.").) In-house documents authored by Neher instructed employees to remind "difficult clients" that, while "we will be disputing your timeshare demerits regularly, you did sign a valid/binding contract with the timeshare, meaning it's ultimately the timeshare's decision to remove those demerits from your credit report." (*Id.* at 110, Doc. No. 265-11, at 45.)

During the Rule 30(b)(6) deposition of Wesley's Chief Operating Officer, Jon Browning, plaintiff's counsel played a recording of top salesman Dan Halliman, telling a prospective customer that, if there are negative marks on the person's credit report because he or she stopped making timeshare mortgage payments, Wesley would "have your credit scrubbed" once the process was "complete and finalized." (Browning Rule 30(b)(6) Dep. 193, Doc. No. 265-6, at 101.) Halliman emphasized that this meant "any negatives, due to the fact that this is being canceled as a fraudulent debt, it allows the negatives to be pulled off the credit report." (*Id.*) Browning acknowledged that it was not true that the timeshare debt would be cancelled as a fraudulent debt. (*Id.* at 194, Doc. No. 265-6, at 102.)

In other words, Wesley's representatives acknowledged that (1) neither Wesley nor any legitimate credit reporting agency has any control over whether Westgate (or other timeshare company) will report a timeshare owner's failure to make mortgage payment to a credit reporting agency; (2) Wesley was not effecting the cancellation of timeshare contracts as "fraudulent debt"; and (3) if Westgate accurately and correctly reported a timeshare owner's default on a timeshare mortgage, neither Wesley nor a legitimate credit repair agency could do anything to "scrub" such a report from the timeshare owner's credit history. Moreover, there is no evidence in the record that Westgate submitted inaccurate negative credit reports relating to any of the defaulting owners who were working with Wesley or that Wesley (or any third party to whom Wesley customers were referred) successfully contested any negative credit reports related to Westgate owners' cessation of payments due under their Westgate contracts.

## H.    Alleged Harm to Westgate

Westgate alleges that its owners who become Wesley customers are harmed by paying Wesley thousands of dollars to assist them in cancelling their timeshares by some legal means when, in actuality, the cancellations are only effected through payment default, for which the timeshare owner does not need Wesley. In addition, according to Westgate, the customers are harmed by being subjected, or potentially subjected, to negative credit reporting, foreclosure, lawsuits for non-payment, and being sued by Westgate if Westgate discovers they falsified affidavits in order to proceed with termination.

Westgate asserts that it is injured by Wesley's practices that have the effect of inducing Westgate owners to default on their mortgages, in particular by leading them to believe that they have a legal basis for stopping payment and for cancellation and that any adverse credit report arising from their payment default will be "repaired" for free as part of Wesley's service.

## II.    LEGAL STANDARD

Summary judgment is appropriate where there is "no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). If the non-moving party asserts that a fact is genuinely disputed, it generally "must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Pittman*, 901 F.3d at 628 ("The nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" (quoting *Anderson*, 477 U.S. at 250)). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## III.    ANALYSIS

Westgate seeks partial summary judgment on several discrete issues related to its TCPA claim: (1) that Wesley engages in the unauthorized practice of law and that such conduct also constitutes a violation of the TCPA, irrespective of whether Westgate possesses a freestanding cause of action based on the unauthorized practice of law, and is "injurious to consumers and Westgate"; (2) that Wesley induces non-payment to Westgate under false pretenses, specifically by misleading customers into believing that their timeshares will be cancelled because they were lied to during the sales process rather than simply through payment default, harming consumers and Westgate, in violation of the TCPA; (3) that Wesley illegally offers credit repair services, in violation of the Credit Repair Organizations Act ("CROA") and the Tennessee Credit Services Business Act ("TCSBA"), which also violates the TCPA, and that its actions cause harm to consumers and to Westgate; (4) that Wesley's violations of the Truth in Caller ID Act ("TICA"), 47 U.S.C. § 227(e), violate the TCPA and cause harm to consumers and Westgate, in particular because Westgate is being "tricked and deceived into forgiving debt" (Doc. No. 264, at 30); and (5) that Wesley "suborns perjury" by persuading customers to falsely swear in affidavits that they are not being assisted by a third-party timeshare exit company in order to induce Westgate to agree to a deed in lieu of foreclosure or relinquishment of a timeshare under its Legacy Program, which constitutes perjury and suborning perjury under Tennessee law, Tenn. Code Ann. §§ 39-16-702(a), 39-16-705(a), thus harming consumers and Westgate and violating the TCPA. Westgate asserts that this conduct violates various prohibitions embodied in the TCPA, specifically Tenn. Code Ann. § 47-18-104(b)(5), (7), (8), (9), (12), (13), (14), (15), (19), (21), and/or (43)(C).

Westgate also seeks partial summary judgment on some of Wesley's affirmative defenses, including its defenses based on: (1) a privilege to protect its economic interests (First Defense) and privilege to compete (Second Defense), (2) unclean hands and comparative fault (Third Defense), (3) laches (Ninth Defense), (4) First Amendment privilege (Tenth Defense), (5) lack of standing (Eleventh Defense), and (6) truth (Twelfth Defense).

And finally, with essentially no argument, Westgate seeks a declaration that Wesley's conduct is deceptive and unfair, violates the TCPA, and is unlawful under the CROA, TCSBA, and the TICA, as applicable, and it asserts that it is entitled to a preliminary injunction barring future violations of these statutes through the date of trial.

## A.    Subsection 47-18-104(b)(43)(C)

Wesley objects to summary judgment on any of the plaintiff's claims under Subsection (b)(43)(C) on the grounds that this subsection is not identified in the TAC as one of the provisions of the TCPA that Wesley's acts violate. The court finds that, even if an alleged violation of this provision is properly a part of this action, despite its not having been alleged in the TAC, Section 47-18-104(b)(43)(C) refers to the advertising or promotion of a service that is "illegal or unlawful to sell in the state." Only through some kind of semantic contortion could this provision pertain to any of the practices in which Wesley allegedly engages. Moreover, subparts (A) and (B) of this subsection pertain to radar detectors and radar jamming devices; this context makes it clear that Subpart (C) was *not* meant to pertain to the purported advertising or offering of unauthorized legal services or the other practices to which Westgate objects. The court finds as a matter of law that this provision does not pertain to the plaintiff's claims.

## B.    Wesley's Affirmative Defenses

In response to the plaintiff's arguments that it is entitled to summary judgment on several of Wesley's affirmative defenses, Wesley contends that there is at least a question of fact as to whether Westgate has "standing" to bring its claim under the TCPA, pointing in particular to questions of fact as to whether Westgate has actually suffered injury arising from Wesley's alleged acts. It also argues that the fact that the court denied a motion to dismiss based on standing does not mean that there do not still exist disputed facts as to standing.

Wesley is incorrect. There is a clear difference between being unable to prove a claim and lacking "standing" to assert such a claim. In its Motion to Dismiss Westgate's TCPA claim,

Wesley argued only that Westgate lacked statutory standing to bring the claim because it was not a "consumer" and did not engage in a "consumer transaction" with Wesley. (*See* Doc. No. 106, at 6–8.)[11] The court roundly rejected that argument as a matter of law, holding unequivocally that "Westgate has statutory standing to assert claims against Wesley under the TCPA, despite not having been engaged in a consumer relationship with Wesley." (Doc. No. 136, at 12.) The court, that is, has already resolved the issue of statutory standing as a matter of law, while leaving open the question of whether Westgate could actually prove its claims.

Further, to the extent a question as to standing did remain following the court's ruling on the Motion to Dismiss, the court now holds that Westgate is entitled to summary judgment on Wesley's "standing" affirmative defense. As Wesley does not attempt to defend its other affirmative defenses addressed in Westgate's motion, and the court finds them to be facially without merit, the court will grant Westgate's Motion for Partial Summary Judgment as to Wesley's First, Second, Third, Ninth, Tenth, Eleventh, and Twelfth Defenses, but without prejudice to Wesley's ability to challenge the factual basis for the plaintiff's claim.

---

[11] As the court noted in ruling on the Motion to Dismiss, Wesley, despite employing the term "standing," did not invoke Rule 12(b)(1) or question the court's subject matter jurisdiction based on a purported lack of Article III standing. Thus, what it actually means by "standing" is that the plaintiff fails to state a claim for which relief may be granted based on the text of the statute. As the court has explained elsewhere, there is a distinction between constitutional standing and such "statutory standing":

> If a plaintiff has standing in a bare-minimum constitutional sense—which a competitor alleging past or imminent economic harm typically will, . . . then the question of whether he can proceed under a particular cause of action is an issue of interpreting the scope of the cause of action, not "standing" as the term is typically used.

*Ciccio v. SmileDirectClub, LLC*, No. 3:19-CV-00845, 2020 WL 2850146, at *13 (M.D. Tenn. June 2, 2020) (Trauger, J.) (citing *Mich. v. Bay Mills Indian Cmty.*, 695 F.3d 406, 411 (6th Cir. 2012); *Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 391 (6th Cir. 2016)).

### C.   TCPA Claim

#### 1.   Overview of the TCPA

The TCPA provides that "[a]ny person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice *declared to be unlawful* by this part, may bring an action individually to recover actual damages." Tenn. Code Ann. § 47-18-109(a)(1) (emphasis added). In other words, to recover damages under the TCPA, a plaintiff must prove (1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused an "ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated." *Tucker v. Sierra Builders*, 180 S.W.2d 109, 115 (Tenn. Ct. App. 2005) (quoting Tenn. Code Ann. § 47-18-109(a)(1)). The Tennessee Supreme Court has recognized that a deceptive act or practice includes a material representation, practice, or omission likely to mislead a reasonable consumer. *Ganzevoort v. Russell*, 949 S.W.2d 293, 299 (Tenn. 1997).

In addition to damages, the TCPA also provides for injunctive and declaratory relief:

> Without regard to any other remedy or relief to which a person is entitled, anyone *affected by a violation of this part* may bring an action to obtain a declaratory judgment that the act or practice violates this part and to enjoin the person who has violated, is violating, or who is otherwise likely to violate this part . . . .

Tenn. Code Ann. § 47-18-109(b) (emphasis added).

The TCPA lists 61 specific acts or practices that are unlawful. § 47-18-104(b)(1)–(62).[12]

Westgate's TAC asserts that Wesley's unfair and deceptive practices violate the following subparts

---

[12] Subsection (b)(27) provides that "[e]ngaging in any other act or practice which is deceptive to the consumer or to any other person" is unlawful, but "enforcement of this subdivision (b)(27) is vested exclusively in the office of the attorney general and reporter." Tenn. Code Ann. § 47-18-104(b)(27).

of that section:

(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship approval, status, affiliation or connection that such person does not have;

. . .

(7) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

(8) Disparaging the goods, services or business of another by false or misleading representations of fact;

(9) Advertising goods or services with intent not to sell them as advertised;

. . .

(12) Representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law;

. . .

(14) Causing confusion or misunderstanding with respect to the authority of a salesperson, representative or agent to negotiate the final terms of a consumer transaction;

(15) Failing to disclose that a charge for the servicing of any goods in whole or in part is based on a predetermined rate or charge, or guarantee or warranty, instead of the value of the services actually performed;

. . .

(19) Representing that a guarantee or warranty confers or involves rights or remedies which it does not have or involve; provided, that nothing in this subdivision (b)(19) shall be construed to alter the implied warranty of merchantability as defined in § 47-2-314;

. . .

(21) Using statements or illustrations in any advertisement which create a false impression of the grade, quality, quantity, make, value, age, size, color, usability or origin of the goods or services offered, or which may otherwise misrepresent the goods or services in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised goods or services to other goods or services;

(22) Using any advertisement containing an offer to sell goods or services when the offer is not a bona fide effort to sell the advertised goods or services. An offer is not bona fide, even though the true facts are subsequently made known to the buyer,

if the first contact or interview is secured by deception . . . .

Tenn. Code Ann. § 47-18-104(b)(5), (7), (8), (9), (12), (14), (15), (19), (21), and (22).[13]

"[T]he standards to be used in determining whether a representation is 'unfair' or 'deceptive' under the TCPA are legal matters to be decided by the courts. However, whether a specific representation in a particular case is 'unfair' or 'deceptive' is a question of fact." *Morrison v. Allen*, 338 S.W.3d 417, 439 (Tenn. 2011) (quoting *Tucker v. Sierra Builders*, 180 S.W.3d 109, 116 (Tenn. Ct. App. 2005)). "A deceptive act or practice is one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as to a matter of fact." *Id.* The concept of unfairness is broader than the concept of deceptiveness, and "it applies to various abusive business practices that are not necessarily deceptive." *Tucker*, 180 S.W.3d at 116. "An act or practice should not be deemed unfair 'unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.'" *Id.* (citing 15 U.S.C. § 45(n)).

A plaintiff bringing a TCPA claim is not required to show that the deceptive act or practice was directed toward the plaintiff. Nonetheless, "plaintiffs asserting claims under the TCPA are required to show that the defendant's wrongful conduct proximately caused their injury." *Steamfitters Local Union No. 614 Health and Welfare Fund v. Philip Morris, Inc.*, No. W1999-01061-COA-R9-CV, 2000 WL 1390171, at *7 (Tenn. Ct. App. Sept. 26, 2000) (citations omitted). "[P]roximate cause is ordinarily a question for the jury to decide unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome." *Id.* at *2.

2. *The Unauthorized Practice of Law*

---

[13] As set forth above, the court finds that § 47-18-104(b)(43)(C), on which Westgate also relies, is inapplicable.

Westgate asserts that Wesley engages in the unauthorized practice of law when it purports to provide customers a "legal" cancellation of their timeshare, presents the customers with Wesley's view of the legal rights and obligations between Westgate and its timeshare owners, purports to explain the legal consequences and mechanics associated with a timeshare owner's eventual death, probate, wills and trusts, inheritance, collections, foreclosure, credit reporting, and so forth, induces Westgate owners to stop making payments to Westgate and advises them on the legal consequences of doing so, encourages customers to sign false affidavits and purports to advise the customer as to whether the affidavit is legal and whether signing it would constitute perjury. In addition, the testimony of the Westgate owners who hired Wesley establishes that, irrespective of Wesley's contractual disclaimers, Wesley's customers uniformly believed that Wesley employed some kind of "legal" process to obtain cancellation of the Westgate owners' timeshares—that it worked with lawyers, that its system had been developed by or approved by lawyers, or that Wesley had some other legitimate basis for believing (and representing to its customers) that it could achieve a "legal" cancellation, and that its system involved something other than simply payment default.

"[T]he Supreme Court of Tennessee possesses the sole and exclusive authority to regulate the practice of law and to define the unauthorized practice of law." *Tenn. Env't Council, Inc. v. Tenn. Water Quality Control Bd.*, 254 S.W.3d 396, 403 (Tenn. Ct. App. 2007) (citation omitted). "Only licensed attorneys may engage in the 'practice of law' or the 'law business' in Tennessee." *Id.* (citing Tenn. S. Ct. R. 7, § 1.01). What constitutes the unauthorized practice of law is not always readily ascertainable. The Tennessee Supreme Court has adopted the following standard for determining what constitutes the practice of law:

> Functionally the practice of law relates to the rendition of services for others that call for the professional judgment of a lawyer. The essence of the professional judgment of the lawyer is his educated ability to relate the general body and philosophy of law to a specific legal problem of a client; and thus, the public interest will be better served if only lawyers are permitted to act in matters involving

professional judgment. Where this professional judgment is not involved, non-lawyers, such as court clerks, police officers, abstracters, and many governmental employees, may engage in occupations that require a special knowledge of law in certain areas. But the services of a lawyer are essential in the public interest whenever the exercise of professional legal judgment is required.

*Id.* (quoting *Petition of Burson*, 909 S.W.2d 768, 775 (Tenn. 1995)).

While the "process of determining whether [an individual's actions] constitute the practice of law is often fact intensive," whether such actions "require the exercise of professional legal judgment" and, thus, constitute the unauthorized practice of law is a question of law. *Id.* at 404, 403. While the unauthorized practice of law is a Class A misdemeanor, Tenn. Code Ann. § 23-3-103(b), the statute prohibiting the unauthorized practice of law provides that only the attorney general and reporter and, in some instances, organized county or municipal bar associations may bring a civil action against any one who violates the prohibition. *Id.* § 23-3-103(c)(1), (d)(1). The statute does not create a private cause of action for an aggrieved individual or a third party affected by another's unauthorized practice of law.

The evidence presented by Westgate establishes that Wesley representatives, despite not being lawyers and notwithstanding disclaimers in Wesley's customer contracts, regularly engage in the unauthorized practice of law vis-à-vis Westgate owners when, for example, they purport to interpret the owners' timeshare contracts and explain the legal ramifications of timeshare agreements and when they claim to be able to "legally" terminate or cancel timeshare agreements, as these are all matters that, on their face, require the exercise of professional legal judgment. *Accord, e.g.*, *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 703 (Tenn. 2008) ("The interpretation of written agreements is a question of law . . . .").

While the unauthorized practice of law does not fall neatly into any of the TCPA's restrictions, and the court is not prepared to state that the unauthorized practice of law is a *per se*

violation of the TCPA,[14] it nonetheless is clear that the *manner* in which Wesley engages in the unauthorized practice of law in this case, specifically through its representations to Westgate owners regarding the "legality" of its services and system, violates the TCPA, insofar as Wesley's representatives, in touting the legality of Wesley's services, "[r]epresent[] that [Wesley's] services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that [the Wesley employees have] a sponsorship approval, status, affiliation or connection that [they do] not have." Tenn. Code Ann. § 47-18-104(b)(5). Wesley's representations about having a "legal" basis for cancelling timeshares may fall within other TCPA prohibitions, notably § 47-18-104(b)(12), which makes it unlawful to represent that a consumer transaction "involves rights [or] remedies . . . that it does not have." The undisputed evidence in this case establishes that these representations actually mislead and tend to mislead customers into believing that Wesley is providing a service different from the service it actually provides and involves legal rights and remedies that simply do not exist.

In other words, while the question of whether a practice is actually unfair or deceptive is generally one of fact, it is simply beyond dispute in this case that Wesley's activities have actually misled customers, and have a tendency to mislead customers, into believing that Wesley is providing a "legal" service when it is not. This conduct caused Westgate owners to believe that they had a legal basis for stopping payment on their mortgages and that they could achieve cancellation of their timeshares through some legal activity engaged in by Wesley, aside from the owners' payment default. Even those customers who testified that they knew that Wesley was not a law firm and that its employees were not lawyers nonetheless believed that Wesley's process was "legal."

---

[14] The TCPA does not specifically define the unauthorized practice of law as a deceptive practice prohibited by the TCPA, even though, for example, it does so define acting in the capacity of a contractor while not licensed as a contractor. Tenn. Code Ann. § 47-18-104(b)(35).

The court finds, in short, that Westgate is entitled to summary judgment on this issue. Wesley engaged, and apparently continues to engage, in the unauthorized practice of law, and the manner in which it does so constitutes a deceptive practice in violation of the TCPA, insofar as it has led and tends to lead its customers—and Westgate's owners—to believe that Wesley's system for cancelling timeshares is based on some legitimate legal grounds. Moreover, Westgate suffers injury resulting from Wesley's deceptive acts, insofar as Wesley's practice of representing its services as somehow "legal" in nature induces people to stop paying mortgages to Westgate.

### 3.      *Offering of Credit Services*

A similar analysis pertains to the offering of credit services. Wesley attempts to defend against this claim on the basis that it never actually provided credit services itself—it farmed out the credit amelioration services to a third party. The point, however, is that Wesley induced customers into hiring it by representing that their credit would not be harmed and that, if it was harmed, Wesley [or a third party] could fix it—despite Wesley's actual knowledge that it could not do anything to prevent Westgate from making truthful and accurate credit reports relating to those customers' failure to make payments on binding and legitimate loans; nor could it do anything to remove truthful and accurate reports once they were made. As set forth above, Wesley's representatives had actual knowledge that Wesley was not effecting the cancellation of timeshare mortgages as "fraudulent debt," and they knew that, if Westgate accurately and correctly reported a timeshare owner's default on a timeshare mortgage on the individual's credit history, neither Wesley nor a legitimate credit repair agency could "scrub" such a report from the timeshare owner's credit history, so long as the report was accurate and correct.[15]

---

[15] Only the passage of time can "repair" or remove this type of credit demerit. As Katie Neher testified regarding this type of report, "legally if nothing's wrong with it, it can stay on your credit for up to seven years." (Neher Dep. 92, Doc. No. 265-11, at 41.)

Moreover, there is no evidence in the record that Westgate submitted inaccurate negative credit reports relating to any of the defaulting owners who were working with Wesley or that Wesley (or any third party to whom Wesley customers were referred) ever successfully contested any negative credit reports related to Westgate owners' cessation of payments due under their Westgate contracts. In other words, Wesley made representations and promises about the credit services it provided (or promised to pay for), knowing that neither it nor a legitimate credit repair company could actually provide such services. Doing so violated the TCPA's prohibition against "representing that a consumer transaction confers or involves rights [or] remedies . . . that it does not have or involve." Tenn. Code Ann. § 47-18-104(b)(12). This conduct also falls within the scope of subsection (b)(5), insofar as Wesley's promises of credit repair constitute representations that its services have "benefits" that they do not have. *Id.* § 47-18-104(b)(5).

In other words, irrespective of whether, as the plaintiff claims, Wesley's conduct violated the CROA and the TCSBA, and irrespective of whether violations of those acts constitute *per se* violations of the TCPA, Wesley's conduct violated the TCPA. In addition, these misrepresentations were part and parcel of the misrepresentations that caused Wesley's customers to stop making their mortgage and maintenance payments to Westgate, thus giving rise to Westgate's claimed injuries.

Although there is variation among the consumers as to whether they actually relied on the statements about credit repair, the evidence is undisputed that Wesley made representations that it would provide services, or ensure the provision of services, that neither it nor any third party could legally provide. And, at least in some cases, these representations influenced Westgate owners' decisions to stop making payments to Westgate. Although the issue of damages remains open, Westgate is nonetheless entitled to summary judgment on its claim that Wesley's false offering of credit repair services as part of the package of services it provided to its customers, along with its purported cancellation of the customers' timeshares, violated the TCPA.

4.       *TICA Violations and Subornation of Perjury*

The alleged TICA violations and subornation of perjury come after—sometimes even long after—Westgate's owners have stopped making payments to Westgate. It is not clear that these practices fall within the purview of any specific subsection of the TCPA, that they have the effect of deceiving consumers, or that Westgate suffers harm from these practices, separate and apart from the harm already incurred as a result of the timeshare owners' cessation of payments to Westgate. The court finds that material factual disputes preclude summary judgment on these sub-issues.

As an aside, however, the court will add that the record clearly indicates that many customers have been blindsided by being confronted with the choice of either lying under oath or, alternatively, telling the truth and thus forfeiting both the chance of extricating themselves from their timeshare contracts *and* the chance of recovering the payments already made to Wesley. These customers find themselves squarely between a rock and a hard place, and neither Wesley nor Westgate can be congratulated for placing them in that position.[16]

**D.       Equitable Relief**

"A preliminary injunction is an extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal quotation marks omitted), one that should "only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A court considering whether to exercise its discretion to grant a

---

[16] Making a false statement under oath constitutes perjury, a Class A misdemeanor under Tennessee law, Tenn. Code Ann. § 39-16-702(a), regardless of whether the oath is made in the context of an official proceeding. Inducing another person to commit perjury is likewise a Class A misdemeanor. *Id.* § 37-16-705(a)–(b). Wesley likely knows this. And Westgate apparently knows that those clients who have been working with a timeshare exit company to get to the brink of cancellation of their timeshares and are required by Westgate to sign an affidavit in order to make it over the finish line will be forced to choose between committing perjury and going back to the starting line on the cancellation process, while also losing the money paid to the timeshare exit company.

preliminary injunction is to consider "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012)). These are factors to be balanced rather than "prerequisites to be met." *Id.* (citation omitted).

Westgate has not established that it is entitled to a preliminary injunction pending trial, simply because its Motion and Memorandum do not address any of the factors relevant to a court's determination of whether to issue a preliminary injunction—including whether it has a strong likelihood of success on the merits. As the plaintiff has made no attempt to establish these factors or to explain how they should be balanced, the court declines to issue injunctive relief.

## IV. CONCLUSION

For the reasons set forth herein, the plaintiff's Motion for Partial Summary Judgment (Doc. No. 263) will be granted in part and denied in part. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge