IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| WESTGATE RESORTS, LTD., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:20-cv-00599 |
| | ) | Judge Aleta A. Trauger |
| WESLEY FINANCIAL GROUP, LLC, | ) | |
| and CHARLES WILLIAM | ) | |
| McDOWELL, III, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM and ORDER**

Among a plethora of other pretrial motions, defendants Wesley Financial Group, LLC and Charles McDowell (collectively "Wesley") have filed a Motion for Status Conference and supporting Memorandum (Doc. Nos. 466, 467), requesting that the court schedule a status conference at a date and time in advance of the pretrial conference (currently set for 1:30 p.m. on Tuesday, July 9, 2024, just one week in advance of trial). The purpose of the proposed status conference would be

> to discuss the Court's establishment of an offer of proof that will require Plaintiffs to demonstrate, for each of the 439 timeshare customers' promissory notes Plaintiffs allege are at issue in this case (each a "Customer Note") and serve as the sole basis for Plaintiffs' Tennessee Consumer Protection Act (the "TCPA") claims in this case, sufficient evidence that (i) one or more Plaintiffs owned the Customer Note at the time the respective timeshare customer defaulted on it, and (ii) the right to any further payments under any such defaulted Customer Note was not previously extinguished by operation of law or otherwise, as a condition to Plaintiffs' presentation of any evidence at trial concerning the respective customer or including them in Plaintiffs' alleged damages pool.[1]

---

[1] The plaintiffs are collectively engaged in the business of developing, financing, managing, and selling timeshare resort properties throughout the United States. (Third Amended Complaint ("TAC"), Doc. No. 217 ¶ 1.) All of the plaintiffs are affiliated and have "Westgate" in

(Doc. No. 466, at 1; *see also* Doc. No. 467, at 1.)

In support of its extraordinary motion, Wesley asserts that such a pretrial offer of proof is necessary, because the evidence now in the record "incontrovertibly" establishes that the plaintiffs "surreptitiously obtained summary judgment in this case by knowingly presenting as evidence for the TCPA claim owners whose Customer Note no Plaintiff owned at the time of default, and as such, could not serve as the basis for Plaintiffs' TCPA claim." (*Id.* at 1–2.) Wesley asserts that, absent proof that a Westgate plaintiff owned a particular Customer Note at the time the customer defaulted on it, Westgate will not be able to establish damages resulting from any alleged TCPA violation. Wesley also asserts that Westgate will not be entitled to damages with respect to any Note that it voluntarily discharged through a deed in lieu of foreclosure or other similar mechanism. Wesley's motion is accompanied by the Declarations of Matthew Silbernagel and Leslie K Abeyta, Jr., to which are attached over 8000 pages of unsorted and uncategorized "public records."

According to Silbernagel, one of Wesley's attorneys of record, he has reviewed the "Securitization Spreadsheet" and two "Relevant Owner Data Spreadsheets," produced by Westgate in discovery. The Securitization Spreadsheet "identifies certain timeshare owners and related promissory notes executed by them to purchase their timeshare interest (a 'Customer Note') that were sold by the originating Plaintiffs to a third-party . . . as part of a securitization." (Doc. No. 467-2, Silbernagel Decl. ¶ 2.) The Securitization Spreadsheet identifies 565 timeshare owners, while the Relevant Owner Data Spreadsheets identify "439 Relevant Owners and their respective

---

their name, and the court will refer to them collectively, in the singular, as "Westgate" or, in the plural, as "the plaintiffs," depending upon what the context requires.

Customer Notes,"[2] 171 of which are also included on the Securitization Spreadsheet. (*Id.* ¶¶ 3–5.) Silbernagel claims that, based on his review of the records, it is undisputed that, for 186 "Relevant Owners" identified on the Relevant Owner Spreadsheets, no plaintiff owned the respective Customer Note at the time of default. (*Id.* ¶ 16.)

Abeyta states that he is the sole owner and President of Vacation Owner Services Title Agency, LLC and has conducted "Title Searches for the 439 Timeshare owners that are at issue in the instant litigation and own or owned a Financed Timeshare." (Doc. No. 467-2, Abeyta Decl. ¶ 10.) According to Abeyta, he was able to locate a recorded timeshare mortgage for 206 of the 439 Relevant Owners but could not locate a recorded mortgage for 233 of the Relevant Owners. (*Id.* ¶¶ 11–12.) Abeyta attached to his affidavit the 8000+ pages of copies of the "documents recorded in the public records" he and his company obtained "when conducting the Title Searches for the Relevant Owners." (*Id.* ¶ 14 and Doc. Nos. 467-3 through -12.) According to Abeyta, as of the "Filing Date,"[3] no named plaintiff was the mortgagee for any of the 206 recorded mortgages he located in the public record. Instead, a "third party other than one of the Plaintiff Entities" owned the mortgages. (Abeyta Decl. ¶ 15.)

In response, Westgate takes issue with the accuracy and relevance of these Declarations. It also asserts that a status conference is unnecessary, and it characterizes Wesley's motion as closely resembling a "grossly untimely . . . second motion for partial summary judgment." (Doc. No. 508, at 1.) Westgate states that, in reality, it does not need to establish that a particular plaintiff was owner of the Customer Notes at any particular moment in time; that Westgate securitizes the

---

[2] These 439 timeshare owners are apparently those with respect to whose default on their respective Notes Westgate attributes to Wesley's interference and for which Westgate seeks damages.

[3] Abeyta does not define the term "Filing Date."

Customer Notes through a mortgage-backed securitization ("MBS") process;[4] and that Wesley received "documentary and deposition discovery" relating to Westgate's MBS process two years ago and never raised any issue about it until now. (*Id.* at 2.) It asserts that, "[i]f Wesley wanted more discovery, or if it believed its arguments had merit, [it] should have done something years ago." (*Id.*) The court, in short, agrees.

As Westgate points out, Wesley sought, and Westgate did not oppose, early pretrial disclosure of the customers regarding whom Westgate seeks damages at trial. (*See* Oct. 20, 2023 Order, Doc. No. 412 (ordering Westgate to produce by November 3, 2023 the "updated spreadsheets that have been agreed to").) As Westgate explains, after it produced its customer list, the parties conferred "as to whether there was . . . a dispute that Wesley caused" any particular customer "to stop making payments," and for the purpose of "potentially resolv[ing] any disputes." (Doc. No. 508, at 2.) Wesley identified approximately 90 customers on Westgate's list with respect to whom it apparently challenged having any role in the customer's default (unrelated to any MBS issue), and Westgate removed those customers from its list. In addition, in the October 20 Order, the court gave Wesley a week to "file a motion that details the additional damages information it is seeking prior to trial." (*Id.*) It did so, and the court subsequently granted in part that motion.

---

[4] Westgate explains the basic structure of its MBS transactions in some detail in its Response, citing the deposition testimony of its corporate representative, John Willman, in support. (*See* Doc. No. 508, at 11–13 (citing Doc. No. 510-2, Willman Dep. excerpts).) Willman's deposition was taken in June 2022 (*see* Doc. No. 510-2, at 1), so it comprises evidence that has been in Wesley's possession for two years. The court will not endeavor to summarize his testimony, but it suffices for present purposes to state that the MBS transactions are complex, involving several layers of entities, but they do not, at least according to Westgate, involve the complete alienation of the Notes such that Westgate suffers no damage when a timeshare purchaser defaults on his Note. Rather, "when Wesley induces a default, Westgate is not receiving the funds that would be used to pay down its debt, and Westgate has to make other arrangements to ensure its debt obligations are repaid." (Doc. No. 508, at 12 (citing Willman Dep. 121–22, 124–25).)

(Doc. No. 419.) Wesley did not thereafter raise any discovery-related issue, until now, on the eve of trial.

Westgate also asserts that "Wesley obtained robust discovery as to Plaintiffs' MBS [process], including business records data for each note, when it was in any MBS, when it came out of any MBS, and the reason why, as well as corporate representative deposition testimony specifically on the topics about which Wesley now falsely claims that Plaintiffs misled them and the Court." (Doc. No. 508, at 5.) Finally, Westgate denies as a legal or factual matter that it needs to "establish that [the plaintiffs] were the owners of the notes at any particular moment in time" and points out that it is not suing on the notes— "i.e., [it is] not seeking to foreclose on or enforce claims against the makers or obligors on the notes." (*Id.* at 4.) Rather, Westgate asserts Tennessee Consumer Protection Act ("TCPA") claims for deceptive and unfair trade practices and seeks damages in the amount of the monetary harm caused by Wesley, which Westgate asserts is "fairly approximated by the balances owed on the notes that Wesley unlawfully induced to default." (*Id.* at 5.)[5] It also asserts that its MBS financing vehicles have no impact on its damages and that it has always been its position that "MBS [has] nothing to do with this action." (*Id.* at 7, 9.)

It is clear from the record before the court that Wesley has had all the discovery to which it is entitled and has long-since been fully apprised of Westgate's MBS process and its theory of damages. To suddenly claim surprise resulting from the purported discovery that third parties were involved in the MBS process appears to be disingenuous. Westgate, of course, will have the obligation of explaining its securitization process to the jury and proving its actual damages, and

---

[5] More specifically, Westgate's damages calculations are based on "Wesley customers' notes where the customers testified that they stopped paying Plaintiffs because of Wesley, or for those customers who did not testify, . . . where their last regular payment to Plaintiffs was made in close temporal proximity with the date the customers hired Wesley." (Doc. No. 508, at 7–8.)

it remains to be seen whether Westgate will, in fact, persuade the jury.[6] Regardless, Wesley has offered no legitimate basis for demanding a pretrial offer of proof at this late date; nor is the court persuaded that a status conference in advance of the pretrial conference would serve any purpose.

Wesley's Motion for Status Conference, therefore, is **DENIED**.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
United States District Judge

---

[6] As Westgate also points out, damages are not a necessary element of its claim for declaratory and injunctive relief under the TCPA. *See* Tenn. Code Ann. § 47-18-109(b).